**[J-38-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 42 WAP 2022 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered March 30, |
| | : | 2022, at No. 430 WDA 2021, |
| v. | : | affirming the order of the Court of |
| | : | Common Pleas of Erie County |
| | : | entered March 9, 2021, at No. CP- |
| WILLIE JAMES HARDY, | : | 25-CR-0001647-1993. |
| | : | |
| Appellant | : | SUBMITTED:  June 21, 2023 |

## <u>OPINION</u>

**JUSTICE WECHT**[1]                                        **DECIDED: JUNE 17, 2025**

Many of the procedural rights that our law guarantees to the accused are designed to reduce the likelihood of wrongful conviction of the innocent.  Despite these protections, and despite the best efforts of those who work within our legal system, criminal justice is fallible.  Wrongful convictions happen.[2]  They are, however, easier to discover today than in any previous time in human history.  This is due in no small part to the wonder of modern science that is DNA analysis.

---

[1]      This matter was reassigned to this author.

[2]      *See Exonerations By Year: DNA and Non-DNA*, THE NATIONAL REGISTRY OF EXONERATIONS, https://exonerationregistry.org/exonerations-year-dna-and-non-dna (last visited June 12, 2025) (depicting a year-by-year graph for the 3,689 exonerations that have occurred in the United States since 1989); *see also* Josh Bowers, *Punishing the Innocent*, 156 U. PA. L. REV. 1117, 1124 (2008) ("There is no longer any serious question that innocent people are charged with and convicted of crimes.").

Nearly a quarter century ago, Pennsylvania's General Assembly recognized that DNA testing may provide a reliable means by which wrongfully convicted persons might establish their innocence. In 2002, our legislature enacted a law that grants individuals access to this powerful, potentially life-changing tool.[3] Interpreting and applying the law's then-extant timing provision, this Court in *Commonwealth v. Edmiston* held a motion for DNA testing to be untimely. The *Edmiston* Court discussed several considerations that, as applied in subsequent cases, had the effect of restricting access to the statute's truth-seeking process.[4] The General Assembly later amended the law via Act 147 of 2018,[5] significantly expanding the ability of convicted persons to obtain DNA testing of evidence in their cases. As amended by this 2018 revision, the law now expressly embraces the retesting of old evidence with newer technology, and it specifies that an applicant may request DNA testing "at any time."[6]

Notwithstanding this legislative expansion of access to DNA testing, the lower courts in this case deemed Appellant Willie James Hardy's motion for DNA testing to be untimely, relying principally upon this Court's pre-Act 147 decision in *Edmiston*. Although that threshold determination would have sufficed to dispose of the matter, both lower courts went on to consider other requirements of the statute, deeming Hardy's motion to be lacking in each particular. The Superior Court interpreted and applied Section 9543.1 in a manner far more restrictive than its text can bear. We reverse that court's order and remand this matter for further proceedings consistent with this opinion.

---

[3]    *See* 42 Pa.C.S. § 9543.1.

[4]    *See Commonwealth v. Edmiston*, 65 A.3d 339, 353-59 (Pa. 2013), *partially overruled on other grounds by Commonwealth v. Small*, 238 A.3d 1267 (Pa. 2020).

[5]    Act of Oct. 24, 2018, P.L. 896, No. 147 ("Act 147").

[6]    42 Pa.C.S. § 9543.1(a)(1), (a)(4).

# I.

This appeal concerns three issues of great importance to the law of post-conviction DNA testing. We must address the timeliness of a request for DNA testing, the implications of new testing technology for the examination of old evidence, and the sufficiency of an applicant's claim of innocence as a prerequisite to testing. Our analysis turns principally upon the language of the governing statute, Section 9543.1, and is informed both by this Court's decision in *Edmiston* and by the subsequent amendments to the statute made by Act 147. Before turning to the facts of this case and the lower courts' treatment of them, it is necessary first to review the statute at issue, the precedent implicated, and the legislative developments that govern the disposition of this matter.

## A. Section 9543.1

In 2002, the General Assembly unanimously passed the law that became Section 9543.1.[7] This was our Commonwealth's first enactment allowing for convicted persons to access DNA testing in order to seek exoneration. Although Section 9543.1 is situated within the same statutory subchapter as the Post Conviction Relief Act ("PCRA"),[8] it is a separate provision that contains distinct requirements, particularly with regard to timeliness. A PCRA petition is the exclusive means by which persons convicted of crimes may obtain collateral review of certain kinds of errors or deprivations of their rights, with substantive relief generally taking the form of a new trial or sentencing hearing.[9] The PCRA imposes a strict, jurisdictional limitation upon the time for seeking such relief. Absent the demonstration of an enumerated exception (of which there are three), any

---

[7] Act of July 10, 2002, P.L. 745, No. 109, § 1.

[8] 42 Pa.C.S. §§ 9541-46.

[9] *See id.* § 9542.

petition under the PCRA "shall be filed within one year of the date the judgment becomes final."[10]

A motion for DNA testing under Section 9543.1 is not a PCRA petition. Section 9543.1 governs a proceeding that is substantively and conceptually distinct from other PCRA litigation. Although the legislature "placed this provision within the larger statutory framework of the PCRA . . . the litigation of a motion for DNA testing under Section 9543.1 is, in substance, a wholly separate proceeding from litigation of a PCRA petition."[11] Section 9543.1 grants persons convicted of a crime in Pennsylvania the right to apply for DNA testing of "specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction."[12] The applicant is required to take certain threshold steps, such as identifying the specific evidence at issue, consenting to provide samples of bodily fluids to be used in the DNA testing, and acknowledging that his own DNA will be uploaded to law enforcement databases and could be used as evidence in other prosecutions.[13] The applicant further must provide a sworn statement asserting his "actual innocence" of the crime in question and swearing that the DNA testing is sought "for the purpose of demonstrating the applicant's actual innocence."[14]

Actual innocence of the crime is what the statute primarily aims to uncover. To that end, and relevant to the instant appeal, the applicant is required to "present a *prima*

---

[10]     42 Pa.C.S. § 9545(b)(1).

[11]     *Commonwealth v. Scarborough*, 64 A.3d 602, 608-09 (Pa. 2013). This Court in *Scarborough* held that a ruling on a Section 9543.1 motion is a final order subject to appeal under the Pennsylvania Rules of Appellate Procedure. *See id.* at 602, 608-11.

[12]     42 Pa.C.S. § 9543.1(a)(1).

[13]     *Id.* § 9543.1(c)(1).

[14]     *See id.* § 9543.1(c)(2)(i). Section 9543.1(c)(2)(ii) contains additional pleading requirements for capital cases, which are not relevant to the instant matter.

*facie* case" demonstrating that the "identity of or the participation in the crime by the perpetrator was at issue in the proceedings" that resulted in the conviction, and that "DNA testing of the specific evidence, assuming exculpatory results, would establish" the applicant's "actual innocence of the offense for which the applicant was convicted."[15] If the applicant fails to make that showing, another provision of Section 9543.1 directs the court to deny the request: "[t]he court shall not order the testing" if it determines that there is "no reasonable possibility" that the "testing would produce exculpatory evidence that . . . would establish the applicant's actual innocence of the offense for which the applicant was convicted."[16]

Although Section 9543.1 and the PCRA differ in substance, they work in harmony. The DNA test results contemplated by Section 9543.1 are intended to lead directly to a new PCRA petition. Under Section 9543.1(f), the results of the DNA testing can establish an exception to the PCRA's time bar and thereby enable the applicant to obtain merits review under the PCRA beyond the generally applicable one-year limit.[17]

---

[15]     *Id.* § 9543.1(c)(3)(i), (ii)(A).

[16]     *Id.* § 9543.1(d)(2)(i).  Following Act 147, Section 9543.1(d)(2) sets different evidentiary thresholds for the court reviewing the claim.  While the court must review the request of an applicant "under State supervision" for a "reasonable *possibility*" of exculpatory results, Act 147 added a heightened "reasonable *probability*" standard for applicants who are "not under State supervision" and for applicants who entered a guilty plea.  *See* Act 147, § 1 (*codified at* 42 Pa.C.S. § 9543.1(d)(2)) (emphasis added); *see also* 42 Pa.C.S. § 9543.1(a)(6) (added by Act 147).  Because Hardy is incarcerated, the "no reasonable possibility" standard is implicated.

[17]     *Id.* § 9543.1(f)(1) ("After the DNA testing conducted under this section has been completed, the applicant may, pursuant to section 9545(b)(2) (relating to jurisdiction and proceedings), during the one-year period beginning on the date on which the applicant is notified of the test results, petition to the court for postconviction relief pursuant to section 9543(a)(2)(vi) (relating to eligibility for relief).").  The original version of Section 9543.1 required the anticipated PCRA petition to be filed within sixty days of the applicant's receipt of the test results, but Act 147 extended that period to one year.  *See* Act 147, § 1.  For further analysis of the relationship between DNA testing under Section 9543.1 (continued…)

The PCRA's time bar stands in contrast to Section 9543.1. Unlike the PCRA's express filing period—one year from the date that a judgment of sentence becomes final—Section 9543.1 does not provide any fixed period of time within which to request DNA testing. It never did. The original version of Section 9543.1 contained one reference to time: before approving DNA testing, the court must determine, *inter alia*, that the "motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice."[18] It was this language that was at issue in *Edmiston*, and that we must consider in the instant case.

**B. *Commonwealth v. Edmiston***

*Edmiston* was the first decision in which this Court addressed the timeliness of a request for DNA testing under Section 9543.1. Edmiston was sentenced to death following his conviction for the rape and murder of a child, crimes to which he had confessed. He filed a serial, untimely PCRA petition and, thus, attempted to establish an exception to the PCRA's time bar. He additionally sought post-conviction DNA testing under Section 9543.1. This Court held that both his substantive PCRA petition and his request for DNA testing were untimely.[19]

---

and the availability of substantive relief under the PCRA, *see Commonwealth v. Murchison*, 328 A.3d 5, 17-20 (Pa. 2024).

[18]     42 Pa.C.S. § 9543.1(d)(1)(iii). This provision remains in the current version of the statute, unchanged from the original enactment in 2002.

[19]     With regard to Edmiston's claim under the PCRA—distinct from his request for DNA testing—this Court applied the then-existing "public record presumption" to defeat Edmiston's assertion that newly discovered facts provided an exception to the PCRA's time bar. Notably, this Court already has overruled *Edmiston* in this regard. *See Small*, 238 A.3d at 1280-86 (overruling, *inter alia*, *Edmiston*). However, *Edmiston*'s discussion of the "timely manner" requirement for DNA testing under Section 9543.1 did not rely upon the public record presumption, and was thus unaffected by this Court's decision in *Small*.

At the time, Section 9543.1 contained one provision that concerned timing: the court could order the requested DNA testing only if the "motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice."[20] The *Edmiston* Court noted that the statute did not define "timely." Nonetheless, the Court analyzed the circumstances of Edmiston's case, ultimately determining that his request was untimely, as it "was forwarded only to delay further the execution of the sentence," *i.e.*, his death sentence.[21]

This Court emphasized that Edmiston had been convicted and sentenced to death in 1989, and had litigated two PCRA petitions, but did not seek DNA testing until 2009—nearly twenty years after his conviction. Edmiston had indicated at trial that he was satisfied with the DNA testing that had been performed, and he did not request further testing. He had known of the evidence that he sought to test since the time of his trial, and he had been continuously represented by counsel. In light of these circumstances, the *Edmiston* Court stated, courts should "exercise a healthy skepticism" of a request for DNA testing.[22] This was particularly so, the Court opined, because the record revealed that Edmiston was "not a likely candidate to be exonerated by DNA testing" given the strength of the evidence against him.[23] The Court reviewed certain particularly damning pieces of evidence, including the fact that Edmiston had confessed to the rape and murder, and that he had drawn a map to assist police in locating the victim's body, which was found precisely where Edmiston said that it would be. Given the strength of the Commonwealth's evidence, the *Edmiston* Court suggested, Edmiston's decision not to

---

[20]      *Edmiston*, 65 A.3d at 342, 354 (quoting 42 Pa.C.S. § 9543.1(d)(1)(iii)).

[21]      *Id.* at 357.

[22]      *Id.*

[23]      *Id.*

seek DNA testing at the time of trial likely was strategic, so that DNA evidence would not confirm his guilt.  This Court deemed these circumstances "probative of the delay and purpose" of Edmiston's request—that he was using the request merely as a pretext to delay his execution, rather than as a genuine attempt to establish his innocence.[24]

Although the PCRA court had referenced advances in DNA testing technology that had occurred since Edmiston's trial, this Court stated that "the statute does not make advances in technology an excuse for failing timely to request DNA testing."[25]  In a passage emphasized by the Superior Court in the instant case, *Edmiston* said of the advances in DNA technology:

> [Edmiston's] guilty status has not changed since his 1989 conviction; advances in technology allegedly occurring after that date do not explain why he, if truly innocent, did not seek immediate testing, or, at the very least, testing available as technology improved during the intervening years, rather than languishing on death row, all the while being supposedly innocent.[26]

In sum, the *Edmiston* Court reasoned, "[t]aking into consideration the strength of the evidence proffered" against Edmiston, his "deliberate decision at the time of trial not to seek further scientific testing," his "counsel's apparent decision not to seek DNA testing throughout these lengthy post-conviction proceedings," and the "belated timing" of his claim, this Court deemed Edmiston's petition to be untimely.[27]

### C. Act 147 of 2018

This Court decided *Edmiston* in 2013.  In 2018, the General Assembly overhauled Section 9543.1.  Of particular significance to the instant case, the legislature specifically

---

[24]     *Id.* at 358.

[25]     *Id.*

[26]     *Id.*

[27]     *Id.* at 358-59.

addressed the time period for requesting DNA testing, and it spoke to the effect of advancements in DNA testing technology.

Act 147 made the following revision to subsection (a)(1), with omitted language denoted here with strikethrough and added language emphasized in boldface:

> An individual convicted of a criminal offense in a court of this Commonwealth ~~and serving a term of imprisonment or awaiting execution because of a sentence of death~~ may apply by making a written motion to the sentencing court **at any time** for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.[28]

Act 147 also added subsection (a)(4), which provides:

> DNA testing may be sought at any time if the motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.[29]

Subsection (a)(4), like subsection (a)(1), now expressly states that post-conviction DNA testing may be sought "at any time." Subsection (a)(4) also includes the language of subsection (d)(1)(iii), the "timely manner" provision that this Court interpreted in *Edmiston*, which also remains in the statute.[30]

While the previous version of subsection (a)(2) authorized testing only of evidence that had not been tested previously, Act 147 specifically authorized the retesting of previously tested evidence with newer technology. This amendment lets the air out of *Edmiston*'s comment that the previous version of Section 9543.1 did not "make advances

---

[28]    Act 147, § 1 (*codified at* 42 Pa.C.S. § 9543.1(a)(1)) (added language in bold).

[29]    Act 147, § 1 (*codified at* 42 Pa.C.S. § 9543.1(a)(4)).

[30]    *See* 42 Pa.C.S. § 9543.1(d)(1)(iii). Subsection (a), entitled "Motion," concerns the general parameters for the applicant's request. Subsection (d), entitled "Order," concerns the findings that the court must make before ordering DNA testing.

in technology an excuse for failing timely to request DNA testing."[31]  That is because Section 9543.1(a)(2) now provides as follows, with the language added by Act 147 emphasized in boldface:

> The evidence may have been discovered either prior to or after the applicant's conviction.  The evidence shall be available for testing as of the date of the motion.  If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, **or the evidence was subject to the testing, but newer technology could provide substantially more accurate and substantially probative results**, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.[32]

Despite these post-*Edmiston* revisions to Section 9543.1, the lower courts here applied *Edmiston* to dismiss Hardy's motion for DNA testing.

With this background and the changes brought about by Act 147 in hand, we now turn to the facts and the lower courts' treatment of the instant case.

## II.

Willie James Hardy was convicted of, and is serving a sentence of life imprisonment for, the June 1993 murder of his former girlfriend, Deborah Will—a crime as to which he always has maintained his innocence.  Hardy originally was convicted of first-degree murder in 1993.  He was awarded a new trial on appeal due to an evidentiary

---

[31]  *Edmiston*, 65 A.3d at 358.

[32]  Act 147, § 1 (*codified at* 42 Pa.C.S. § 9543.1(a)(2)) (added language in bold). There is no suggestion that the instant appeal implicates the pre-Act 147 provisions that concern an applicant's counsel declining to seek DNA testing before a trial predating January 1, 1995, or the trial court refusing a request for funds to pay for DNA testing despite the applicant's indigency.

error, was retried in 1996, and was again convicted.[33] On July 15, 2020, Hardy filed a petition in the Court of Common Pleas pursuant to Section 9543.1, seeking DNA testing of evidence involved in his case—some of which had never been tested for DNA, and some of which had been tested before trial using the inferior technology that was available in the 1990s.[34] Invoking the new statutory provisions added by Act 147, Hardy sought to have both classes of evidence tested with modern scientific techniques that were not available at the time of his trials.

Central to Hardy's claim were several factual averments: that the evidence against him was entirely circumstantial; that no physical or forensic evidence connected him to the murder; and that the DNA testing that was performed at the time excluded him as a contributor. Hardy filed the required statement swearing that he is actually innocent of the crime, and that he filed his motion for the purpose of demonstrating his innocence. Hardy further provided a thorough summary of, and citation to, the evidence offered at his trials, in which he detailed both the Commonwealth's and his own theory of how Will was murdered. The Commonwealth responded, providing its own perspective on the evidence. Although each party emphasized the evidence favorable to its own view, neither disputed the accuracy of the other's account of the evidence adduced at trial. As this case involves a contested claim of actual innocence, the facts of the murder are disputed, but the parties' differing theories of the case proceed from a largely undisputed trial record. That record may be summarized as follows.

---

[33] *Commonwealth v. Hardy*, 663 A.2d 248 (Pa. Super. 1995) (Table). The Superior Court affirmed Hardy's judgment of sentence following his 1996 retrial, *Commonwealth v. Hardy*, 714 A.2d 1084 (Pa. Super. 1998) (Table), and this Court denied *allocatur*. *Commonwealth v. Hardy*, 727 A.2d 128 (Pa. 1998) (*per curiam*).

[34] "Petition for Post-Conviction DNA Testing Pursuant to 42 Pa. Cons. Stat. § 9543.1," 7/15/2020.

## A. Factual Background

Deborah Will was found dead on the morning of June 22, 1993. Will's body was in the back seat of her Chevrolet Blazer, which was parked near railroad tracks a few blocks away from Erisco Industries, a wire-forming factory in City of Erie, at which both Will and Hardy worked. Will had been strangled with twine, and her clothes were notably dirty. Due to the type of twine and the chemical composition of the dirt, investigators came to believe that Will had been killed at the Erisco plant. This assumption was bolstered by the discovery of a threaded bolt under Will's body, which was consistent with a missing bolt that was used to lock the gate to a loading dock at Erisco. There were signs of a struggle. Flesh was found under Will's fingernails, blood stained the back of her shirt, and ligature marks appeared on and around her neck. Seminal fluid was detected in her vagina and on her underwear. Investigators also discovered a used condom near Will's vehicle, along with a card from an establishment called the Jockey Health Club.

Will's body was discovered by her then-boyfriend, Kenneth Logan, who had gone looking for her at the Erisco plant after learning that she did not return home from her evening shift. Will worked that shift with Hardy, who was the supervisor that evening. Will helped Hardy close down the plant at the end of their shift. This meant that Hardy was the last person known to have seen Will alive. Because Will and Hardy had previously maintained an intimate relationship, and because reports suggested that Hardy still had feelings for Will, Hardy became an obvious suspect. In statements to investigators and testimony at his 1993 trial,[35] Hardy recounted that Will had helped him to shut down the plant after their shift, and that the two stood at Will's car and talked for about five minutes. Hardy claimed that he went back into the factory to ensure that some

---

[35] Hardy did not testify at his retrial, which occurred in 1996.

closing tasks had been completed, and that, when he returned to the loading dock, Will and her vehicle were gone. Hardy claimed that he then departed the plant on his motorcycle, after noticing that the bolt that usually secured the accordion gate to the loading dock was missing.

Investigators grew suspicious of Hardy's account. Records indicated that the Erisco alarm was set at 11:52 p.m. Erie Police Sergeant Stephen Franklin later would testify that he observed an individual leaving Erisco on a motorcycle at approximately 11:50 p.m. A passerby, Angela Stone, testified that, while she was walking home from a convenience store at approximately 11:50 p.m., she noticed a Chevrolet Blazer—the make and model of Will's vehicle—parked by the railroad tracks behind Erisco; she testified that the vehicle had not been there several minutes earlier. Hardy had clocked out of Erisco at 11:31 p.m., and investigators concluded that Hardy's description of his closing procedure left several minutes unaccounted for. Hardy later performed a reenactment for investigators, walking them through his actions in closing the Erisco plant that night. Investigators believed that Hardy's accounts left a gap in the evening's timeline. The Commonwealth's theory was that Hardy killed Will during that gap of time, moved her body and her vehicle, and then returned to Erisco to set the alarm.

The Commonwealth supported its theory of the timeline with the testimony of Erisco employee Dale Teribery. Teribery testified that he stayed late that night to wait for Will after their shift ended at 11:30 p.m. Teribery initially thought that he saw Will's vehicle leave, but when he pursued the vehicle, he discovered that he was mistaken. Teribery returned to the Erisco plant and drove around the building looking for Will. Teribery noted that the lights were still on at the loading dock while he circled the plant, but that, after he rounded a corner and briefly lost sight of the loading dock, the lights were off and the door to the loading dock was closed. Teribery then assumed that he had missed seeing Will

leave. Investigators had Teribery re-enact his drive around the plant, and determined that he likely left Erisco at approximately 11:45 p.m. Teribery later concluded that he could not have missed seeing someone entering or leaving the Erisco plant during the time that he was waiting for Will. Under the Commonwealth's theory, Teribery did not miss seeing Will leave because she was still inside the plant with Hardy, who murdered her and then moved her body and her vehicle within the minutes that elapsed between Teribery's departure from the area and Hardy's return, at which point Hardy set the Erisco alarm, activating it at 11:52 p.m.

In his petition for DNA testing, Hardy pointed to Teribery and to Will's boyfriend, Logan, as potential suspects. Hardy asserted that investigators either did not consider these men or too-quickly ruled them out. Hardy noted that Teribery had testified that he did not come to work the next day because he was too upset about Will's murder, even though it was unclear, Hardy claimed, how or when Teribery learned of Will's death. Hardy asserted that investigators apparently never considered Teribery to be a suspect, and never obtained his fingerprints, boot prints, work clothes, or blood sample to compare with the physical evidence recovered from Will's body and vehicle. As for Logan, investigators did briefly consider him to be a suspect, but ruled him out upon learning that Logan had clocked into work at 11:00 p.m. at the Lord Corporation, a manufacturing plant located a few miles from Erisco. Hardy presented evidence suggesting that employees at the Lord Corporation would have been able to leave the premises during their shifts, and that it took only a few minutes to drive from the Lord Corporation to the Erisco plant. Additionally, DNA testing revealed that Logan was the source of the semen found in Will's vagina. Logan ultimately explained to investigators that he and Will engaged in consensual intercourse in the afternoon before Will's shift, but Hardy suggested that

Logan's account was suspicious. Logan also acknowledged that he was familiar with the Jockey Health Club, the business identified on the card found near Will's vehicle.

In his petition for testing, Hardy also identified another Erisco employee who recently had been paroled on an aggravated assault conviction, and whom police did not investigate. Hardy further noted that the area around Erisco generally was considered to be unsafe and that Will had recently complained of vandalism to her car at Erisco, but that investigators failed to consider the possibility that an unidentified perpetrator could have attacked Will. Instead, Hardy averred, investigators focused upon him to the exclusion of all other potential leads.

Forensic evidence played a significant role in Hardy's trials, but its significance was disputed. Forensic pathologist Katherine Jasnosz, M.D., testified for the Commonwealth concerning the autopsy performed on Will. Dr. Jasnosz did not conduct the autopsy herself; that examination was performed by Takeshi Imajo, M.D. Dr. Jasnosz, after watching a partial video of the autopsy and reviewing Dr. Imajo's report, concluded that Will's death had occurred between twelve and fifteen hours before the autopsy, which was conducted at 2:00 p.m. on the day that Will's body was found. This placed the time of death between 11:00 p.m. and 2:00 a.m., which was consistent with the Commonwealth's theory. However, Dr. Imajo, the pathologist who actually performed the autopsy, testified for the defense that Will had died approximately six to eight hours before the autopsy, which would have been between approximately 5:00 a.m. and 7:00 a.m. The parties also differed over other aspects of the forensic evidence. The Commonwealth's expert, for instance, testified that the dirt on Will's clothes matched dirt that was sampled from the floor of the Erisco plant, which had a unique chemical composition. This was central to the Commonwealth's theory that Will had been killed inside Erisco. Hardy contested that fact. Hardy presented the testimony of a forensic expert who countered

that the source of the dirt could not be established to a reasonable degree of scientific certainty.

One detail about the physical and forensic evidence was particularly significant to Hardy's claim of innocence: none of it implicated Hardy. Investigators had detected approximately twenty-five finger and palm prints from Will's car, none of which matched Hardy's. Several shoe prints were collected from around the scene, none of which matched the shoes that Hardy wore that night. The seminal fluid in Will's vagina and underwear came from Logan, not Hardy. The blood stain on the back of Will's shirt matched her DNA, not Hardy's. There was no blood on Hardy's clothes, nor any of Will's hair. No hair found on any piece of evidence matched Hardy's. In short, the Commonwealth was not able to produce any physical evidence that connected Hardy to the murder, and all DNA analysis that was conducted excluded Hardy as a contributor.

As Hardy explained in his petition, the "defense's theory was that Ms. Will left Erisco alive to meet an alternate suspect, and she was killed later in the early morning hours of June 22, 1993 (consistent with the original autopsy and Dr. Takeshi Imajo's testimony)."[36] Hardy noted that the evidence against him was entirely circumstantial, and that the defense presentation at trial was critical of the investigation. Hardy highlighted the fact that no forensic evidence linked him to the crime, and that the investigation centered exclusively upon him despite the existence of potential alternative suspects.

The Commonwealth responded to Hardy's petition.[37] The Commonwealth did not dispute Hardy's account of the trial evidence, but rather offered its own narrative describing that evidence in a more damning light, consistent with the theory that it

---

[36] *Id.* ¶ 65.

[37] "Commonwealth's Response to Defendant's Petition for Post-Conviction DNA Testing," 9/14/2020 ("Commonwealth's Response").

presented at trial. The Commonwealth emphasized that Hardy was a karate expert. It recounted the details of an incident of vandalism to Will's car in the days before her murder, which, the Commonwealth implied, was likely Hardy's doing. The Commonwealth provided a detailed account of the testimonies of Teribery, Stone, and Sergeant Franklin, all of which supported the Commonwealth's theory concerning the timeline of the events, which, in turn, supported the conclusion that Hardy murdered Will inside the Erisco plant after the end of their shift. To the same end, the Commonwealth stressed the opinion of its forensic pathologist that Will was killed at approximately midnight.

The Commonwealth emphasized the other evidence suggesting that Will was killed inside the Erisco plant. Some co-workers had stated that Will's body and clothing were far dirtier than one would expect in light of Will's ordinary work duties, and that her clothes appeared as though she had crawled on the floor of the factory (or scuffled with somebody on the floor, as the case may be). The Commonwealth stressed the opinion of its forensic expert that the dirt on Will's clothing matched samples of dirt from the Erisco factory floor, that the twine found around Will's neck was consistent with the material and length of twine used at Erisco, and that it was highly likely that both the dirt and the twine came from inside the Erisco plant. Likewise, the Commonwealth noted that the threaded bolt found next to Will's body was an exact match for the bolt that was missing from the accordion gate to the Erisco loading dock, which was further suggestive of the location where she was killed.

The Commonwealth detailed its investigation of Hardy. As Will's ex-boyfriend, and as the last person known to have been with Will inside the Erisco plant, Hardy was a likely suspect. Investigators also learned that Hardy had requested to take a vacation day on the day after Will's murder. The Commonwealth argued that Hardy's explanations and

reenactments failed to account for the entire period of time between approximately 11:30 p.m., when the employees clocked out for the evening, and 11:52 p.m., when the Erisco alarm activated. The Commonwealth noted that Hardy's various descriptions of the events were inconsistent, and that none accounted for the entire time period in question. The Commonwealth emphasized that, in his interviews with investigators, Hardy acknowledged that he was the last person who was with Will inside the Erisco plant, and admitted that he repeatedly had attempted to rekindle his relationship with Will and had even begged her to come back to him, to no avail.

In light of this evidence, the Commonwealth concluded that it was "clear that Mr. Hardy was the last person inside" the Erisco plant with Will, that he "had the motive to carry out these crimes," that he "had the ability to carry out these crimes," and that he had failed to provide "any possible explanation as to how anyone other than him could have committed this crime without Mr. Hardy observing [the] same."[38]

## B. Request for DNA Testing

Following his conviction in 1996, Hardy remained incarcerated and unrepresented for nearly two decades before his case came to the attention of the Pennsylvania Innocence Project, a nonprofit organization that advocates for individuals whom it believes may have been wrongfully convicted.[39] With the aid of Innocence Project attorneys, Hardy filed the instant petition, seeking DNA testing of multiple items taken

---

[38] Commonwealth's Response at 12.

[39] The Innocence Project is a "non-profit organization dedicated to providing *pro bono* legal and related investigative services to indigent prisoners whose actual innocence may be established through post-conviction DNA evidence. To date, the work of the Innocence Project and affiliated organizations has led to the exoneration, by post-conviction DNA testing, of 375 individuals nationwide for crimes they did not commit. The exonerations of 19 Pennsylvanians involved such testing." Innocence Project *Amicus* Br. at 1.

from the crime scene—some of which had never been tested, and some of which had been tested before trial using technology that is primitive compared to modern standards.

Hardy invoked the 2018 revisions to the DNA testing statute, which now authorizes such testing "at any time."[40]  Hardy noted that Act 147's "recent amendments to the post-conviction DNA testing statute explicitly provide that evidence that was previously tested may be retested when 'newer technology could provide substantially more accurate and substantially more probative results.'"[41]  Hardy stated that some pieces of evidence—the blood on Will's shirt, the flesh under her fingernails, her underwear, and the condom found near her vehicle—were analyzed with polymerase chain reaction ("PCR") and DQ-Alpha testing, which is less accurate and requires a far greater sample of DNA than modern techniques.  Hardy sought to have the evidence examined by today's standards, with Short Tandem Repeat ("STR") testing, including its derivatives and related offshoots, Y-STR, miniFiler, and mitochondrial DNA testing.[42]  Of particular interest to Hardy is the advent of "Touch DNA" or "Contact Trace DNA" analysis, which can produce a DNA profile from skin cells left behind when a person touches an object, such as a murder weapon.[43]

Hardy averred that he could "present a *prima facie* case" demonstrating that the "identity of or the participation in the crime by the perpetrator was at issue" in his trials, and that "DNA testing of the specific evidence, assuming exculpatory results, would establish" his "actual innocence of the offense" for which he was convicted.[44]  Hardy

---

[40]     42 Pa.C.S. § 9543.1(a)(1), (a)(4).

[41]     Petition ¶ 89 (quoting 42 Pa.C.S. § 9543.1(a)(2)).

[42]     *Id.* ¶ 94.

[43]     *Id.* ¶¶ 102-04.

[44]     42 Pa.C.S. § 9543.1(c)(3)(i)-(ii)(A).

stressed that the identity of Will's killer was at issue at trial, that he always had maintained his innocence, and that he had filed the required sworn statement asserting his actual innocence.[45] He proffered two theories by which the testing could demonstrate his actual innocence: a "redundant profile" theory and a "database" theory. The "redundant profile" theory posits that, if DNA analysis were to reveal a profile from another individual on multiple pieces of evidence, that would imply that the profile belongs to the true perpetrator because it is unlikely that there is an innocent explanation for the same DNA to be found on multiple pieces of evidence.[46] The "database" theory suggests that, if DNA analysis were to produce a "hit" in a database such as CODIS,[47] then the true perpetrator could be identified.[48] Hardy additionally suggested that, should a database hit lead to the discovery of an alternative perpetrator, that individual might confess to the crime when confronted with such powerful evidence.[49]

Having satisfied all of the statutory requirements to obtain DNA testing, Hardy requested testing of the following items: (1) the twine believed to be the murder weapon (which had never been tested for DNA); (2) Will's clothing; (3) the fingernail scrapings taken from Will's fingernails; (4) the finger and palm prints taken from Will's car; (5) Will's car keys; (6) Will's purse; (7) items dumped from Will's purse; (8) the octagonal bolt believed to have been taken from the accordion gate at Erisco; (9) the condom found

---

[45]  See id. § 9543.1(c)(2)(i) (requiring an applicant for DNA testing to provide a sworn statement asserting the applicant's "actual innocence of the offense for which the applicant was convicted and that the applicant seeks DNA testing for the purpose of demonstrating the applicant's actual innocence").

[46]  Petition ¶¶ 120-25.

[47]  "CODIS" refers to the Combined DNA Index System, a DNA database maintained by the Federal Bureau of Investigation. See 42 Pa.C.S. § 9543.1(h) (added by Act 147).

[48]  Petition ¶¶ 126-32.

[49]  Id. ¶ 130 (citing Commonwealth v. Conway, 14 A.3d 101, 110 (Pa. Super. 2011)).

outside Will's car[50]; (10) a tissue with seminal fluid found near Will's car; (11) vaginal smears from Will's rape kit; and (12) the business card from Jockey Health Club found at the scene.[51]

The Commonwealth disputed Hardy's entitlement to DNA testing. The Commonwealth first argued that Hardy's motion was untimely pursuant to this Court's decision in *Edmiston*, Act 147 notwithstanding. The Commonwealth additionally suggested that Hardy failed to establish a *prima facie* case that DNA testing would demonstrate his actual innocence. The Commonwealth asserted that Hardy's claim was premised upon his mere expectation that his DNA would be absent from the evidence in question, and it quoted a purported "axiom" that "absence of evidence is not evidence of absence."[52] To the extent that Hardy pleaded for a chance to determine if someone else's DNA was present on any of the evidence, the Commonwealth argued that such would not be probative, given that the items in question were likely touched by many other people. The Commonwealth then reiterated its view that the circumstantial evidence against Hardy was compelling, and it characterized Hardy's request for DNA testing as nothing more than a "Hail Mary."[53]

Hardy filed a reply to the Commonwealth's Response, in which he disputed the Commonwealth's comparisons to *Edmiston* and reiterated that Section 9543.1 now permits requests for DNA testing "at any time." Hardy further contended that he had

---

[50]     Hardy noted that pre-trial testing of the DNA on the condom in question excluded Hardy, but he averred that the DNA profile obtained was not uploaded to a DNA database such as CODIS. Hardy further claimed that there was an unsolved rape in the same area several days before Will's murder, and that a database hit could potentially reveal the identity of both Will's killer and the perpetrator of the unsolved rape. Petition ¶ 81 n.12.

[51]     *Id.* ¶ 81.

[52]     Commonwealth's Response at 19.

[53]     *Id.* at 20.

adequately set forth a *prima facie* case that DNA testing, assuming exculpatory results, would reveal his innocence, and he reiterated his "redundant profile" and "database" theories. Hardy sought to confirm the applicability of Section 9543.1(a)(2)'s authorization for retesting with newer technology, and he submitted an affidavit of DNA expert Alan Keel, who detailed the current state of DNA testing modalities, its exponential improvement over the science that was employed in the 1990s, and the ways that modern DNA testing can lead to the discovery of an alternative perpetrator, such as through a database hit or the detection of a redundant profile on significant pieces of evidence. The Commonwealth did not dispute the averments in Keel's affidavit, nor question his statements concerning modern DNA testing technology.

### C. Trial Court Decision

The trial court[54] denied Hardy's petition. The court divided the evidence into two categories: items that previously had been tested for DNA, and items that had not been tested. With regard to the former, the trial court reasoned that, because Hardy already had been excluded as a contributor to any DNA collected from the items, testing them again with newer technology would not "provide substantially more accurate and substantially probative results."[55] The trial court suggested that further testing could only confirm that Hardy's DNA remains absent from the items. The trial court did not address Hardy's theory that retesting of the items with more advanced technology could reveal the identity of a different perpetrator. As for evidence that never had been tested, the court opined that Hardy could not obtain testing now, because some form of DNA testing

---

[54] We refer here to the "trial court" rather than the "PCRA court" because requests for DNA testing are distinct from petitions filed under the PCRA, and because Section 9543.1 directs that the applicant file the motion for DNA testing in the court that imposed the applicant's sentence. *See* 42 Pa.C.S. § 9543.1(a)(1).

[55] 42 Pa.C.S. § 9543.1(a)(2); *see* Trial Ct. Op., 3/9/2021, at 14.

was available before his trial, notwithstanding the fact that the evidence was not actually tested at that time.[56]

Additionally, the trial court concluded that Hardy's petition was untimely based upon this Court's decision in *Edmiston*, notwithstanding the subsequent 2018 amendments allowing Hardy to file "at any time." The trial court stated that the "facts in the instant case are more compelling than those in" *Edmiston*, though the court did not explain that characterization.[57] Under *Edmiston*, the trial court explained, the "compelling evidence of [Hardy's] guilt," coupled with certain other considerations, rendered his petition untimely.[58] The trial court emphasized that Section 9543.1 was enacted in 2002, and that Hardy did not seek DNA testing until 2020, which represented a period of delay even longer than had passed in *Edmiston*. As in *Edmiston*, Hardy was aware, since the time of his trial, of the evidence that he sought to test, and he did not aver that any new evidence had come to light. And, like the applicant in *Edmiston*, Hardy claimed that advances in DNA testing technology could help to establish his innocence, but the *Edmiston* Court had deemed that suggestion unconvincing. The trial court acknowledged Hardy's argument that, after Act 147, Section 9543.1 now allows him to seek DNA testing "at any time," but the trial court found Hardy's position "unavailing" because a "literal reading of the statute requires that the petition be timely filed."[59] Thus, notwithstanding

---

[56] *See* 42 Pa.C.S. § 9543.1(a)(2) ("If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial . . . .").

[57] Trial Ct. Op., 3/9/2021, at 15.

[58] *Id.*

[59] *Id.* at 16 (citing 42 Pa.C.S. § 9543.1(a)(4)).

the changes wrought by Act 147, the trial court declared Hardy's petition to be untimely under *Edmiston*.

### D. Superior Court Decision

The Superior Court affirmed the trial court's order denying Hardy's petition.[60] With regard to timeliness, the Superior Court approved the trial court's invocation of *Edmiston*, similarly concluding that Hardy had failed to explain why he waited until 2020 to seek DNA testing.

The Superior Court briefly reviewed *Edmiston*. The pivotal facts in *Edmiston*, the Superior Court opined, were that the applicant there did not seek DNA testing for over nineteen years after his conviction, and that he did not seek additional testing upon the enactment of Section 9543.1 in 2002 or during his earlier post-conviction litigation.[61] The Superior Court emphasized the *Edmiston* Court's comment that the applicant's "guilty status has not changed since his 1989 conviction," and that "advances in technology allegedly occurring after that date do not explain why he, if truly innocent, did not seek immediate testing" rather than "languishing on death row, all the while being supposedly innocent."[62] Extending that commentary to Hardy, the Superior Court reasoned:

> Instantly, we agree with the trial court that *Edmiston* is analogous. The items Hardy seeks to test were available at trial, and some of the items were tested and the test results excluded Hardy as a contributor. Hardy did not request the additional testing before or after either of his trials. Also, Hardy did not raise the issue of DNA testing in his PCRA petition. As noted, the post-conviction testing provisions were enacted in 2002. Hardy did not request testing after the enactment. While Hardy was unrepresented following the denial of his request for PCRA relief, he has proffered no explanation as to why he did not seek DNA testing, *pro se* or otherwise, between 2002 and 2020, when he filed the instant petition. In sum, Hardy

---

[60]    *Commonwealth v. Hardy*, 274 A.3d 1240 (Pa. Super. 2022).

[61]    *Id.* at 1248 (discussing *Edmiston*).

[62]    *Id.* (quoting *Edmiston*, 65 A.3d at 358).

has not explained why, "if truly innocent, [he] did not seek immediate testing, or, at the very least, testing available as technology improved during the intervening years, rather than languishing [in prison], all the while being supposedly innocent." *Edmiston*, 65 A.3d at 358.[63]

The Superior Court provided no discussion of the amendments effectuated by Act 147 in 2018, and it did not acknowledge that Section 9543.1 now allows an applicant to seek testing "at any time"—language that did not appear in the statute when this Court decided *Edmiston*.[64] Instead, the Superior Court faulted Hardy for not seeking testing as early as 2002.

Beyond the purported untimeliness of the petition, the Superior Court endorsed the trial court's reasoning that DNA testing—both of untested and previously tested evidence—could not produce evidence of Hardy's innocence. With regard to Hardy's reliance upon Act 147's authorization of retesting if "newer technology could provide substantially more accurate and substantially probative results,"[65] the Superior Court block-quoted the trial court's conclusion that Hardy's exclusion from previously tested DNA precluded additional testing, as more testing purportedly could only reveal a redundant absence of Hardy's DNA.[66] Appearing to endorse the trial court's conclusion in that regard, the Superior Court moved on to the items that had not been tested previously. Here too, the Superior Court merely summarized and apparently adopted the trial court's conclusion that DNA testing was unavailable to Hardy now because the evidence in question had been known before trial and because some form of DNA testing had been available at that time.[67]

---

[63]     *Id.* at 1249 (references to "Appellant" altered to "Hardy").

[64]     42 Pa.C.S. § 9543.1(a)(1), (a)(4) (added by Act 147).

[65]     *Id.* § 9543.1(a)(2) (added by Act 147).

[66]     *Hardy*, 274 A.3d at 1249 (quoting Trial Ct. Op., 3/9/2021, at 13-14).

[67]     *Id.* at 1249-50 (citing Trial Ct. Op., 3/9/2021, at 14).

The Superior Court additionally opined that Hardy had failed to establish a *prima facie* case that DNA testing would demonstrate his actual innocence, as is required by Section 9543.1(c)(3). The Superior Court faulted Hardy for portraying the facts in a manner favorable to his position, rather than in the "light most favorable to the Commonwealth as verdict winner."[68] The Superior Court cited no authority suggesting that evidence must be viewed in this manner in the context of post-conviction DNA testing.

"Most importantly," the Superior Court stated, because the record contained "considerable circumstantial evidence" of Hardy's guilt, Hardy purportedly "fail[ed] to explain how the results of DNA testing would demonstrate his actual innocence."[69] The court did not address Hardy's explanation that a "redundant profile" or a "database hit" could identify a perpetrator other than himself. The Superior Court also did not acknowledge that Section 9543.1(c)(3) states that the requisite *prima facie* case must be assessed by "assuming exculpatory results" of the requested DNA testing.[70]

The Superior Court then discussed the evidence that Hardy sought to have tested. The court explained why each item, in its view, would not be capable of producing probative DNA test results. The court noted that Hardy sought testing of "evidence taken from [Will's] body, car, and debris in the area surrounding the car."[71] The court stated that Hardy "fail[ed] to establish the relevance of such evidence," because "trial testimony established [that Will] was killed at the factory, not in the area where her car was moved."[72] Thus, the Superior Court reasoned, Hardy had failed to show a "compelling

---

[68]     *Id.* at 1250.

[69]     *Id.*

[70]     42 Pa.C.S. § 9543.1(c)(3)(ii).

[71]     *Hardy*, 274 A.3d at 1250.

[72]     *Id.*

nexus between the requested testing and the murder."[73]  Will's body was, of course, moved to the location where it was discovered, presumably by her killer.  The Superior Court did not explain the basis for its suggestion that the killer could not have left DNA on Will's body, on her car, or on items at the scene where her body was found.

The Superior Court next observed that trial testimony indicated that Will's car and the items discovered therein could have been contaminated by those who found her body, as well as by police and other emergency responders.  Thus, the Superior Court declared: "While the presence of [Hardy's] DNA would be inculpatory, its absence would not be exculpatory."[74]  With regard to the remaining items—the "fingernail clippings, clothing, rape kit, garage-door bolt, and twine"—the Superior Court opined that each would be incapable of producing exculpatory evidence.[75]  With regard to the rape kit and the fingernail scrapings, the Superior Court reiterated that Kenneth Logan had testified that he and Will engaged in consensual sex on the afternoon of her murder, and that previous testing of the fingernail scrapings revealed only Will's own DNA.  As for the octagonal bolt, the twine, and Will's clothes, the Superior Court stated that "neither the presence nor absence of [Hardy's] DNA would be meaningful."[76]  The court reasoned that multiple people could have touched the bolt and the twine.  Furthermore, because Erisco employees regularly wore protective gear during their shifts, and because Hardy had been seen wearing gloves that evening, "the absence of his DNA would not demonstrate his actual innocence."[77]

---

[73]     *Id.*  The words "compelling nexus" do not appear in Section 9543.1.

[74]     *Id.*

[75]     *Id.* at 1251.

[76]     *Id.*

[77]     *Id.*

The Superior Court concluded by rejecting Hardy's claim as consisting of mere "conjecture and speculation," which it opined was insufficient to "establish a *prima facie* case of actual innocence."[78] The Superior Court accordingly affirmed the trial court's order denying Hardy's petition.

## III.

We granted Hardy's petition for allowance of appeal, accepting review of the following questions:

> (1) Was Hardy's Petition for Post-Conviction DNA Testing Pursuant to 42 Pa.C.S. § 9543.1 timely?
>
> (2) Did Hardy satisfy the requirements of 42 Pa.C.S. § 9543.1(a)(2), with regard to evidence previously tested for DNA and evidence not previously tested for DNA?
>
> (3) Did Hardy present a *prima facie* case demonstrating that the DNA testing sought, assuming exculpatory results, would establish his actual innocence of the offense for which he was convicted?[79]

### A. Legal Standards

Although a request for DNA testing is distinct from a claim for relief under the PCRA, we have explained that our review of the denial of a motion under Section 9543.1 similarly is "guided by our well established standard of review of an order denying post-conviction relief," under which our "task is to examine whether the lower court's rulings are supported by the evidence of record as well as whether they are free from legal error."[80] Our review of this matter, however, also necessarily requires that we interpret

---

[78]     *Id.* (citing *Commonwealth v. Walsh*, 125 A.3d 1248, 1254-55 (Pa. Super. 2015)).

[79]     *Commonwealth v. Hardy*, 289 A.3d 889 (Pa. 2022) (*per curiam*) (references to "Appellant" altered to "Hardy").

[80]     *Commonwealth v. Wright*, 14 A.3d 798, 813-14 (Pa. 2011) (citing *Commonwealth v. Morales*, 701 A.2d 516, 520 (Pa. 1997)). This Court in *Wright* held that an applicant's confession to a crime is not a *per se* bar to relief under Section 9543.1. *See id.* at 800.

the language of Section 9543.1. Statutory interpretation is a question of law, over which our standard of review is *de novo* and our scope of review plenary.[81]

In interpreting legislative enactments, we are guided by the Statutory Construction Act.[82] The object of all statutory interpretation is "to ascertain and effectuate the intention of the General Assembly."[83] Generally, the "plain language of the statute provides the best indication of legislative intent."[84] The Statutory Construction Act instructs that, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."[85] Where the language of a statute is "not explicit," a court may consider other factors, presumptions, and canons of construction in order to ascertain the General Assembly's intent.[86]

**B. Arguments**

Hardy contends that the lower courts erred in declaring his petition untimely under *Edmiston*. In Hardy's view, *Edmiston* is a problematic decision even absent consideration of the subsequent legislative developments in Act 147. Hardy focuses upon *Edmiston*'s

---

[81] *See id.* at 814; *see also Commonwealth v. Crosby*, 329 A.3d 1141, 1148-49 (Pa. 2025).

[82] 1 Pa.C.S. §§ 1501-1991.

[83] *Id.* § 1921(a).

[84] *Crosby*, 329 A.3d at 1149 (quoting *Commonwealth v. Kingston*, 143 A.3d 917, 922 (Pa. 2016)) (internal quotation marks omitted).

[85] 1 Pa.C.S. § 1921(b).

[86] *Id.* § 1921(c). This subsection provides a non-exclusive list of considerations that a court may consider when interpreting ambiguous statutory language, which include: (1) the "occasion and necessity for the statute"; (2) the "circumstances under which it was enacted"; (3) the "mischief to be remedied"; (4) the "object to be attained"; (5) the "former law, if any, including other statutes upon the same or similar subjects"; (6) the "consequences of a particular interpretation"; (7) the "contemporaneous legislative history"; and (8) "[l]egislative and administrative interpretations of such statute." *Id.* § 1921(c)(1)-(8).

suggestion that the "strength of the evidence" against the applicant is a consideration bearing upon the timeliness of a request for DNA testing.[87]  Although Hardy concedes that the quality of the evidence may bear upon the applicant's ultimate ability to establish a *prima facie* case that DNA testing would establish the applicant's innocence, he observes that the timeliness provisions of Section 9543.1 do not suggest any inquiry into the merits.  Hardy analogizes this point to decisions in which this Court has held that analyzing the timeliness of a PCRA petition does not involve consideration of its merits.[88]  Hardy discusses the language of Section 9543.1(a)(4), emphasizing that, after Act 147, an applicant may seek DNA testing "at any time."[89]  In light of this, Hardy argues that we should overrule *Edmiston.*

Even if *Edmiston* remains "good law," however, Hardy argues that his case is readily distinguishable.  Hardy points out that, unlike the applicant in *Edmiston*, Hardy never made a deliberate decision to decline further DNA testing before trial.  Hardy is serving a life sentence rather than awaiting a death sentence, and thus has no incentive to delay.  And the evidence against Hardy was far weaker than the evidence in *Edmiston* (though Hardy maintains that this final factor should not bear upon the question of timeliness).

As for the lower courts' conclusions that Hardy failed to meet Section 9543.1(a)(2)'s requirements with regard to both previously tested and previously untested evidence, Hardy argues that those tribunals ignored the plain language of the statute. After Act 147, Hardy stresses, the statute expressly authorizes retesting where "newer

---

[87]     Hardy's Br. at 35 (quoting *Edmiston*, 65 A.3d at 358).

[88]     *Id*. at 37 (citing *Commonwealth v. Cox*, 146 A.3d 221, 227 (Pa. 2016); *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1267-68 (Pa. 2008); *Commonwealth v. Bennet*, 930 A.2d 1264, 1270 (Pa. 2007)).

[89]     *Id.* at 36 (quoting 42 Pa.C.S. § 9543.1(a)(4)).

technology could provide substantially more accurate and substantially probative results."[90]  Hardy argues that he sufficiently established this predicate in his petition, and additionally with the expert opinion of Alan Keel, whose affidavit the Commonwealth did not rebut or dispute.  Summarizing Keel's description of the dramatic improvements in DNA testing since the 1990s, Hardy explains that retesting of the evidence here could reveal the identity of an alternative perpetrator, and that there was no basis for the lower courts' conclusion that retesting could not produce probative evidence.[91]

With regard to the evidence that had not been tested previously, Hardy notes that the lower courts denied his request merely because there was some form of DNA testing technology available before his trials.  But Section 9543.1(a)(2) precludes such testing only where "the DNA testing requested" was available, which, Hardy argues, refers to the specific form of testing requested in the applicant's motion.[92]  The "testing requested" here, Hardy argues, is the modern STR-based testing that was not available in the 1990s.  Barring additional testing in cases where there was *any* DNA testing technology available before trial, Hardy argues, would effectively make it impossible for anyone in his position to access DNA testing—a consequence that contradicts both the language and the intent of Section 9543.1.

Finally, Hardy argues that he satisfied Section 9543.1(c)(3)(ii), and that he adequately set forth a *prima facie* case that DNA testing, assuming exculpatory results, would establish his actual innocence.  Hardy notes that, although this Court has never interpreted this provision, the Superior Court addressed its requirements in

---

[90]     *Id.* at 47 (quoting 42 Pa.C.S. § 9543.1(a)(2)).

[91]     *Id.* at 50.

[92]     *Id.* at 51 (quoting 42 Pa.C.S. § 9543.1(a)(2)).

*Commonwealth v. Conway* and in its *en banc* decision in *In re Payne*.[93]  The court in *Conway* explained the theories that Hardy proffered here, including the "redundant profile" and "database" theories, as viable ways in which DNA testing could reveal an applicant's "actual innocence"—a term that *Conway* understood to mean that it is "more likely than not that no reasonable juror would have found [the defendant] guilty beyond a reasonable doubt."[94]  The *en banc* panel in *Payne*, moreover, stressed that the inquiry under Section 9543.1(c)(3) is "not the likelihood of proof of innocence, but whether it is within the realm of reason that some result(s) could prove innocence."[95]  Hardy notes that the Superior Court in this case did not mention, or even cite, *Conway* or *Payne*.  Rather, contrary to those precedents, the Superior Court concluded that Hardy had offered only "conjecture and speculation."[96]

Hardy additionally faults the Superior Court for declaring that Hardy "fail[ed] to articulate why results from newer testing would be probative" and that he "fail[ed] to explain how the results of DNA testing would demonstrate his actual innocence."[97]  Hardy notes that the "Superior Court never once referred to Keel's expert opinion, which does both of those things."[98]  Hardy proceeds again through the "redundant profile" and "database" theories, explaining that DNA testing could produce evidence of his innocence if another DNA profile were to be repeatedly discovered on items of evidence, or if it produced a hit in a federal or state DNA database.

---

[93]  *Id.* at 55 (citing *Commonwealth v. Conway*, 14 A.3d 101 (Pa. Super. 2001); *In re Payne*, 129 A.3d 546 (Pa. Super. 2015) (*en banc*)).

[94]  *Id.* at 55-56 (quoting *Conway*, 14 A.3d at 109).

[95]  *Id.* at 56 (quoting *Payne*, 129 A.3d at 563).

[96]  *Id.* (quoting *Hardy*, 274 A.3d at 1251).

[97]  *Id.* at 57 (quoting *Hardy*, 274 A.3d at 1250).

[98]  *Id.*

Because he has satisfied all of the requirements of Section 9543.1, Hardy maintains, we should reverse the order of the Superior Court and remand for the performance of the requested DNA testing or, at the very least, an evidentiary hearing on any outstanding issues.[99]

The Commonwealth responds that this Court correctly interpreted the "timely manner" requirement in *Edmiston*, that *Edmiston* should continue to govern the inquiry into the timeliness of a motion for DNA testing, and that Hardy's petition was untimely under *Edmiston*. The Commonwealth points out that Section 9543.1 continues to require that DNA testing be sought in a "timely manner," and that, notwithstanding Hardy's request for testing with modern technology that was unavailable at the time of his trial, *Edmiston* opined that the statute "does not make advances in technology an excuse for failing timely to request DNA testing."[100] Further tracking *Edmiston*'s rationale, the Commonwealth stresses that Hardy did not seek DNA testing for twenty-four years after his conviction. The Commonwealth contends that Hardy was "apparently satisfied" with the pre-trial DNA testing, and suggests that his present request for DNA testing was strategic, given that Hardy is imprisoned for life and "has nothing to lose and everything to gain" from the requested testing.[101] The only distinctions that the Commonwealth discerns between *Edmiston* and the instant case are that *Edmiston* was a capital case and that Hardy was not represented by counsel during much of the period following his conviction. These distinctions, in the Commonwealth's view, are not significant.

---

[99]     Hardy's position is supported by *amici curiae* the Innocence Project and the Innocence Network. In their briefs, *amici* discuss the significant breakthroughs and advancements in DNA testing that have occurred in recent decades, and they stress the importance of DNA testing to the discovery of wrongful convictions.

[100]    Commonwealth's Br. at 33 (quoting *Edmiston*, 65 A.3d at 358).

[101]    *Id.* at 34.

With regard to the second issue on appeal, the Commonwealth argues that Hardy failed to establish the requirements to obtain DNA testing with regard to both previously tested and previously untested evidence. The Commonwealth's argument on this matter tracks the lower courts' analyses. The previously tested evidence can be tested again only if newer technology could provide "substantially more accurate and substantially probative results,"[102] which the Commonwealth claims is not the case because Hardy already had been excluded as the source of any DNA previously discovered on the items in question.

Because all previous DNA testing showed that Hardy's DNA "was excluded from all the tested materials," the Commonwealth claims that additional testing would likely only confirm that Hardy's DNA remains absent from the evidence, which would be "consistent with the evidence adduced at trial."[103] The possibility that DNA testing could reveal the identity of a different person, the Commonwealth argues, is "nothing more than a smokescreen to disguise the fact that even if [Hardy's] DNA was not found on the tested items, it would not take away from the fact that a jury convicted him twice, based on exactly these findings in the 1993 and 1996 trials respectively."[104] As for the evidence that has never been tested for DNA, the Commonwealth emphasizes that Hardy knew of the existence of this evidence before his trials, yet did not seek DNA testing then or during his post-conviction litigation. The Commonwealth again suggests that Hardy's decision in that regard was strategic. DNA testing technology existed at the time, and, due to

---

[102] 42 Pa.C.S. § 9543.1(a)(2).

[103] Commonwealth's Br. at 40. The Commonwealth additionally adopts the Superior Court's suggestion that "evidence from the area around the victim's car is not relevant because trial testimony established that the victim was killed at the factory, not in the area where the car was moved." *Id.* (citing *Hardy*, 274 A.3d at 1250).

[104] *Id.*

Hardy's "apparent strategy, the trial courts were never given an opportunity to deny a request for DNA testing, so Hardy is not entitled to it now."[105]

Finally, the Commonwealth argues that Hardy has failed to set forth a *prima facie* case that "DNA testing of the specific evidence, assuming exculpatory results, would establish" his "actual innocence."[106] Invoking the Superior Court's language, the Commonwealth argues that this showing requires "more than conjecture or speculation."[107] It further asserts that the "mere absence" of Hardy's DNA from the evidence would not suffice to meet his burden.[108] The Commonwealth acknowledges Hardy's theories, derived from the Superior Court's decision in *Conway*, that a redundant DNA profile or a DNA database hit may reveal the identity of an alternative perpetrator. Nonetheless, the Commonwealth argues that much of the evidence in question could have been handled by multiple innocent individuals. The Commonwealth further emphasizes that the evidence of Hardy's guilt, although circumstantial, was compelling. Accordingly, the Commonwealth argues that the Superior Court "rightfully determined that testing of the requisite DNA evidence would be meaningless" and that Hardy "offers only 'conjecture and speculation'" as to what the DNA testing could reveal, thus precluding him from meeting the requirements of Section 9543.1.[109]

---

[105]    *Id.* at 45.

[106]    42 Pa.C.S. § 9543.1(c)(3)(ii)(A).

[107]    Commonwealth's Br. at 47.

[108]    *Id.* (citing *Payne*, 129 A.3d at 563; *Commonwealth v. Heilman*, 867 A.2d 542 (Pa. Super. 2005)).

[109]    *Id.* at 51 (quoting *Walsh*, 125 A.3d at 1254-55). The Commonwealth's position is supported by *amicus curiae* the Pennsylvania District Attorney's Association, which offers arguments consistent with those that the Commonwealth advances.

## IV.

The lower courts' decisions in this case do not survive a fair reading of either the law or the averments in Hardy's petition. The Superior Court read and applied Section 9543.1 in a flawed and unduly strict manner. The precedential effect of that court's opinion suggests barriers to relief that are not consistent with the text or the intent of the statute, particularly in its present incarnation following Act 147. The Superior Court further failed to acknowledge, let alone analyze, the amendments of Act 147 that concern the issue of timeliness. It is to that threshold issue that we first turn.

### A. Timeliness

The most pressing and immediately apparent legal problem revealed by this appeal is the question of how we should understand the amended law's timeliness provisions. After Act 147, subsection (a)(1)—the very first words of the statute—now states:

> An individual convicted of a criminal offense in a court of this Commonwealth may apply by making a written motion to the sentencing court *at any time* for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.[110]

There is nothing unclear about this language. This subsection specifies who may request DNA testing, where they must file the motion, and when they may do so, *i.e.*, "at any time." As noted above, the words "at any time" were a new addition to the statute in 2018. That language provides a marked contrast from the version of the statute that this Court addressed when it decided *Edmiston* in 2013.

Although subsection (a)(1) is clear, a potential difficulty arises from the text of subsection (a)(4), which was another addition of Act 147. Subsection (a)(4) provides, in

---

[110]     42 Pa.C.S. § 9543.1(a)(1) (emphasis added).

full: "DNA testing may be sought *at any time if the motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.*"[111] Although subsection (a)(4) echoes the timing provision of the new subsection (a)(1)—"DNA testing may be sought at any time"—it also repeats the language of subsection (d)(1)(iii), the "timely manner" provision that this Court interpreted in *Edmiston*.[112] That language, of course, pre-dates Act 147.

At first blush, subsection (a)(4) appears paradoxical. Like subsection (a)(1), it authorizes an applicant to seek DNA testing "at any time"; yet, like subsection (d)(1)(iii), it simultaneously states that the motion must be "made in a timely manner." The "timely manner" requirement necessarily implies that a motion that is not "timely" may be dismissed. However, such a finding, if premised upon the passage of time alone, would directly contradict the immediately preceding authorization to seek DNA testing "at any time." Given this facial tension in the language, Section 9543.1(a)(4) is not amenable to a plain language reading.[113] The question becomes one of identifying the principles of statutory construction that allow us to interpret the language in the manner that best effectuates the General Assembly's intent.

---

[111]   *Id.* § 9543.1(a)(4) (emphasis added).

[112]   *See id.* § 9543.1(d)(1)(iii) (providing that, before ordering DNA testing, the court must determine that the "motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.").

[113]   "A statute is ambiguous when there are at least two reasonable interpretations of the text." *A.S. v. Pa. State Police*, 143 A.3d 896, 905-06 (Pa. 2016). Although we often frame statutory ambiguity in these terms, we have also found ambiguity in a statute where its language raises "non-trivial interpretive difficulties" on its face. *McGrath v. Bureau of Pro. & Occupational Affs., State Bd. of Nursing*, 173 A.3d 656, 662 n.8 (Pa. 2017). This latter formulation is descriptive of the challenge posed by the language of Section 9543.1(a)(4).

The challenge presented by the word "timely" is that it raises the question: "timely in relation to what?" As discussed, Section 9543.1 is deeply intertwined with the PCRA, yet it lacks the clear parameters that the PCRA places upon the filing of a timely petition: one year after sentence finality, absent a specific exception. There is a salient reason for this open-endedness in Section 9543.1. Post-conviction DNA testing is meant to uncover new information about criminal cases—even decades-old cases—that, if exculpatory, may lead to new claims under the PCRA. The results of DNA testing are expressly meant to establish an exception to the PCRA's time bar, and to lead to a substantive claim of after-discovered evidence under the PCRA.[114] That is the exclusive procedural mechanism by which an innocent person in this Commonwealth can use DNA evidence to obtain relief from the courts, and to perhaps receive relief from a wrongful conviction. The "timely manner" language in Section 9543.1 is vague because it must be, given that the proceedings are part and parcel of the applicant's ability to use the DNA test results to establish an exception to the PCRA's time bar. It is the PCRA, not Section 9543.1, that provides the critical time requirements for obtaining substantive post-conviction relief.

It is worth emphasizing that Act 147's amendments did not define the phrase "timely manner" in Section 9543.1, despite prior judicial commentary on its lack of clarity.[115] The General Assembly is aware that the courts of this Commonwealth deal with a tremendous volume of litigation concerning the PCRA's time bar and the exceptions thereto. If the legislature wishes to set a fixed time period for filing a motion, it has the authority and ability to do so. When overhauling Section 9543.1 in 2018, the General Assembly did not establish a fixed time period along the lines of the PCRA's time

---

[114]    *See* 42 Pa.C.S. §§ 9543.1(f), 9543(a)(2)(vi).

[115]    *See Edmiston*, 65 A.3d at 356.

bar.  To the contrary:  the legislature twice declared that DNA testing may be sought "at any time."[116]

Simultaneously, Act 147 reiterated the "timely manner" clause:  the motion may be filed "at any time," and must be "made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice."[117]  Here, it becomes significant that this is the identical language that this Court interpreted and applied in *Edmiston*.

This Court in *Edmiston* was presented with the same problem that we face today when construing the "timely manner" clause:  to wit, the statute says that the motion must be for the purpose of proving "actual innocence" and not to cause "delay," but it "does not otherwise define timeliness."[118]  Absent any other definition of a "timely manner," the *Edmiston* Court relied principally upon the remainder of the clause in which those words appear, *i.e.*, that the motion must be made "for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice."  In ruling the motion before it "untimely as a matter of law," the *Edmiston* Court primarily emphasized factors that supported the Court's conclusion that Edmiston's motion was not a genuine attempt to establish innocence, but rather was "forwarded only to delay further the execution of the sentence," *i.e.*, his death sentence.[119]  Absent any other indicia of its meaning, *Edmiston* interpreted the phrase "timely manner" in light of the purpose to cause "delay" referenced in the same statutory provision.

---

[116]     42 Pa.C.S. § 9543.1(a)(1), (a)(4).

[117]     *Id.* § 9543.1(a)(4).

[118]     *Edmiston*, 65 A.3d at 356.

[119]     *Id.* at 357.

Portions of *Edmiston*'s analysis present a risk of misunderstanding. The *Edmiston* Court's discussion of the "strength of the evidence" against Edmiston, his representation status, his extensive history of post-conviction litigation, and his failure to seek earlier testing of known evidence were not articulations of generalized grounds for finding a DNA motion to be "untimely" in the abstract. This was not a list of factors for courts to cite in order to dismiss motions as untimely in any given case. Rather, they were considerations that the *Edmiston* Court found "probative of the delay and purpose" of Edmiston's request.[120] They were case-specific findings about a known capital PCRA litigant whom the Court believed was engaging in delay tactics rather than making a genuine effort to establish his innocence.

Setting aside Act 147's subsequent addition of the words "at any time" for a moment, because the "timely manner" clause in subsection (a)(4) is identical to the clause that this Court interpreted in *Edmiston*, it continues to be reasonable to understand the "timely manner" language as being informed primarily by the remainder of the clause in which those words appear: that the motion is "not to delay the execution of sentence or administration of justice," but rather is "for the purpose of demonstrating the applicant's actual innocence."[121] The General Assembly's decision to repeat that language in subsection (a)(4) following *Edmiston* also implicates a canon of construction that has salience here.

We find that the provisions of Act 147 are particularly well-suited to the application of a legislative acquiescence or adoption theory,[122] given certain indicia in Act 147 that

---

[120]    *Id.* at 358.

[121]    42 Pa.C.S. § 9543.1(a)(4), (d)(1)(iii).

[122]    The Statutory Construction Act states a presumption that, "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon (continued…)

the General Assembly responded specifically to this Court's precedent on Section 9543.1. As noted above, the legislature maintained and expressly repeated the language of the "timely manner" clause that this Court interpreted in *Edmiston*. Even more telling is the General Assembly's incorporation into Section 9543.1 of the holdings in two of this Court's other decisions, *Commonwealth v. Wright* and *Commonwealth v. Scarborough*. In *Wright*, this Court held that a confession to a crime was not a bar to DNA testing under Section 9543.1.[123] Act 147 then added the new Section 9543.1(a)(5), which states that "a plea of guilty to a crime of violence . . . or a confession given by an applicant concerning the offense for which the applicant was convicted, shall not prohibit the applicant from asserting actual innocence under subsection (c)(2) or the court from making a determination and ordering DNA testing under subsection (d)(2)."[124] In *Scarborough*, this Court held that a ruling on a Section 9543.1 motion was a final order

---

such language." 1 Pa.C.S. § 1922(4). This Court has explained that this principle of statutory interpretation applies "whenever our Court has interpreted the language of a statute, and the General Assembly subsequently amends or reenacts that statute without changing that language," in which case it is "presumed that the General Assembly intends that our Court's interpretation become part of the subsequent legislative enactment." *Verizon Pa., Inc. v. Commonwealth*, 127 A.3d 745, 757 (Pa. 2015). We have also cautioned that this doctrine is not absolute, that its invocation is discretionary under the Statutory Construction Act, and that the General Assembly will not always be able to correct this Court when we err in interpreting its intent. *Small*, 238 A.3d at 1285 (quoting 1 Pa.C.S. § 1922) ("the following presumptions, among others, *may* be used") (*Small*'s emphasis); *see also id*. ("[T]his Court's departure from the plain language of a statute should not be viewed categorically as placing the burden upon the General Assembly to detect our error and to marshal the resources to correct it.").

[123] *Wright*, 14 A.3d at 800 ("[A] confession, even if previously and finally adjudicated as voluntary, does not constitute a *per se* bar to establishing a *prima facie* case, and the convicted person may, therefore, obtain DNA testing under Section 9543.1 if he or she meets all of this statute's pertinent requirements."); *see supra* n.80.

[124] 42 Pa.C.S. § 9543.1(a)(5) (added by Act 147).

subject to immediate appeal, not an unappealable interlocutory order under the PCRA.[125] Act 147 then added the new Section 9543.1(d)(3), which clarifies that: "Any DNA testing order under this section shall constitute a final order. An applicant or the Commonwealth may appeal a decision denying or granting a DNA testing order in accordance with the Pennsylvania Rules of Appellate Procedure."[126] Given these unmistakable incorporations of *Wright* and *Scarborough*, Act 147 provides a uniquely strong indication that the legislature responded to this Court's decisions when amending Section 9543.1 in 2018.

What does Act 147 mean for *Edmiston*? Understood in its proper context as primarily concerned with undue delay, little in Act 147 contradicts *Edmiston*'s rationale. The only portions of *Edmiston*'s analysis that are apparently inconsistent with Act 147 are its comments about Edmiston's trial having taken place over twenty years prior, its dismissive treatment of the idea that the availability of new technology was relevant under the statute, and its comments that Edmiston did not seek testing with that newer technology at an earlier time—factors that were perhaps suggestive of the "belated timing" of his request.[127] The new language of Act 147 that an applicant may request DNA testing "at any time" renders irrelevant any consideration of the amount of time that has elapsed between certain events and the filing of the motion. However, the thrust of *Edmiston*'s rationale concerning the "timely manner" clause's prohibition of delay and gamesmanship need not be disturbed by the language of Act 147. Indeed, given the General Assembly's express adoption of other precedents of this Court in Act 147, it may

---

[125] *Scarborough*, 64 A.3d at 602 (holding that "an order granting a motion for post-conviction DNA testing pursuant to Section 9543.1 is a final order under Pa.R.A.P. 341"), 610 (noting that "when the trial court enters an order either granting or denying the testing, the litigation under this section is at an end"); *see supra* n.11.

[126] 42 Pa.C.S. § 9543.1(d)(3) (added by Act 147).

[127] *Edmiston*, 65 A.3d at 357-58.

be presumed in this instance that the legislature intended to incorporate *Edmiston*'s interpretation of the full clause. At the same time, the General Assembly specifically declared that "DNA testing may be sought at any time" to make clear that there is no fixed time frame for filing the motion, and no invisible clock running against the applicant.[128] In this light, Act 147 can be seen as superseding *Edmiston* in one sense, or perhaps more accurately, modifying its approach. Scrapping it for parts, perhaps. The General Assembly corrected the portions of *Edmiston*'s rationale that may be read inconsistently with its intent.

Notably, these purely temporal considerations that are in facial conflict with Section 9543.1 after Act 147's passage were also, as it happens, the sole factors that the Superior Court used here to compare Hardy's case to *Edmiston*. That court reduced *Edmiston* to the observations that Edmiston waited "more than 19 years after his conviction" to seek DNA testing, and that he "did not seek additional DNA testing at trial; or in 2002, when the post-conviction testing provisions were enacted; or in his second PCRA petition."[129] Due to the passage of time before Hardy filed the instant petition for testing, the Superior Court deemed this matter analogous to *Edmiston*. But beyond the mere passage of time, this case bears no resemblance to *Edmiston*, and that decision's discussion of indicia of delay is wholly inapplicable. Hardy is not facing a death sentence. He is not a frequent post-conviction litigant. He was unrepresented for decades before the present litigation. And the evidence against him was circumstantial, disputed, and less than overwhelming. The only significant similarity is that, as in *Edmiston*, time has elapsed since Hardy's trial, or since some other point in time that the statute does not specify. Had the Superior Court taken note of the fact that the statute was amended after *Edmiston* expressly to

---

[128]    42 Pa.C.S. § 9543.1(a)(4).

[129]    *Hardy*, 274 A.3d at 1248 (discussing *Edmiston*, 65 A.3d at 344, 357-58).

allow requests "at any time," it might have recognized the facial problem in dismissing the instant petition based merely upon the passage of time.[130]

Given this Court's discussion in *Edmiston* and the changes wrought by Act 147, the apparent tension between the words "at any time" and "timely manner" is not as intractable as it may appear on the surface. The words "at any time" mean what they say. A motion under Section 9543.1 may be filed at any time. Per *Edmiston*, the "timely manner" language, still otherwise undefined, is concerned primarily with the "delay the execution of sentence or administration of justice" language that appears a few words later in the clause. A motion designed to cause delay is not "timely." The facial tension in the language of Section 9543.1(a)(4) can be resolved in this manner. Nonetheless, even if we disregard the statute's history and this Court's prior interpretation in *Edmiston*, and even if we were to view the legislative language—"at any time," and in a "timely manner"—as an oxymoron locked in mortal conflict with itself, the analysis would still favor the phrase "at any time" under numerous other principles of statutory construction. It is consistent with neither the text nor the intent of Section 9543.1 to construe the "timely manner" language as providing some indeterminate temporal basis for dismissing a request for DNA testing without consideration of its merits.

As a general matter, when faced with a conflict in statutory provisions, the more recent provision prevails, and the specific controls the general.[131] "At any time" is one of

---

[130]    Consideration of the 2018 amendments to the statutory language may also have relieved the court's confusion as to "why [Hardy] did not seek DNA testing, *pro se* or otherwise, between 2002 and 2020, when he filed the instant petition." *Hardy*, 274 A.3d at 1249. The answer, of course, is that significant portions of Hardy's petition were premised upon language added to the statute by Act 147 in 2018, which not only offered a new opportunity to use modern DNA testing technology to test evidence in old cases, but also expressly invited such motions "at any time."

[131]    *See* 1 Pa.C.S. § 1933 (where conflict between special and general provisions is irreconcilable, "the special provisions shall prevail and shall be construed as an exception (continued…)

Act 147's additions to the statute in 2018, while the "timely manner" clause dates back to the initial enactment of Section 9543.1 in 2002, though it was repeated verbatim in Act 147 as well. Moreover, "at any time" is not only more recent; it is more specific as well. Absent the provision of a defined time period such as that found in the PCRA, the statute's reference to a "timely" motion is inherently imprecise. If we set aside *Edmiston*'s prior interpretation, we are left with a general reference to timeliness with no reference point for comparison. But in Act 147, the General Assembly specifically addressed the time for filing: the motion may be filed "at any time." Because "at any time" directly and specifically concerns the time period for filing the motion, it is entitled to primacy over the older, generalized reference to a "timely manner."

Most importantly, Section 9543.1 is remedial legislation designed to redress the serious injustice of a wrongful conviction. Ambiguous language in such a statute must be construed liberally to effectuate its remedial and humanitarian purposes.[132] As the *en banc* panel of our Superior Court observed in *Payne*, Section 9543.1 "should be regarded

---

to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail"); *id.* § 1934 ("[W]henever, in the same statute, several clauses are irreconcilable, the clause last in order of date or position shall prevail."); *id.* § 1935 (where there is a conflict between two statutes enacted by the same General Assembly, "the statute latest in date of final enactment" shall prevail); *id.* § 1936 (where there is a conflict between two statues enacted by different General Assemblies, "the statute latest in date of final enactment shall prevail"); *see also LaFarge Corp. v. Commonwealth, Ins. Dep't*, 735 A.2d 74, 76 (Pa. 1999) (noting the statutory construction principle that "the specific controls the general").

[132] *See generally Herold v. Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ.*, 329 A.3d 1159, 1189 n.22 (Pa. 2025) (discussing the doctrine of liberal construction of remedial legislation); *Borough of Youngwood v. Pa. Prevailing Wage Appeals Bd.*, 947 A.2d 724, 731 (Pa. 2008) (identifying law at issue as "remedial statute; therefore, any exceptions to its remedial provisions are to be narrowly construed"); *see also* 1 Pa.C.S. § 1928(c) (providing that, except for specified categories of laws, the "provisions of a statute shall be liberally construed to effect their objects and to promote justice").

as a remedial statute and interpreted liberally in favor of the class of citizens who were intended to directly benefit therefrom, namely, those wrongly convicted of a crime."[133] The legislature's repeated declaration that an applicant may seek testing "at any time" suggests a broad reading of the law's timeliness provisions, a reading that is consistent with the statute's remedial purpose. By contrast, interpreting the "timely manner" language as imposing an unspoken requirement that an applicant seek DNA testing within an unspecified and indeterminate period of time after some event—whether that be conviction, the development of a certain technology, the passage of a law, or something else—is not consistent with any other language of the statute, and could serve only an exclusionary function, and an unpredictable and idiosyncratic one at that. There is no indication that the General Assembly intended our courts to count to an undefined number of days and then close the courthouse doors to potentially meritorious claims of innocence. Both the language and the intent of Section 9543.1 indicate the exact opposite.[134]

---

[133]    *Payne*, 129 A.3d at 554 (quoting *Conway*, 14 A.3d at 113).

[134]    For this reason, we expressly reject the dissent's suggestion that the "timeliness" of a request for DNA testing should be assessed through resort to any list of non-statutory inquiries into the dates that certain DNA testing technologies were developed, or that any particular legislation was enacted. *See* Concurring and Dissenting Opinion (Mundy, J.) at 31 ("What type of DNA testing is being requested, and how long prior to the motion was that kind of testing reasonably available? Is the DNA testing now being requested materially better than previous methods, in the sense that prior methods could not have revealed some of the relevant information the current request seeks to discover? Even if the methodology previously existed and was widely used, has there been a substantial change in the information contained in DNA databases that might reasonably produce relevant 'hits' now which would not have been produced before? Did the statute previously allow that kind of DNA testing to be sought, and if not, when was the effective date of the legislative amendment that allowed it? Is it true that the applicant could not realistically have known of the advances in the science presently relied upon because he was in prison and unrepresented during the delay period?"). None of these inquiries has any basis in the text of Section 9543.1. To dismiss a request as untimely due to the answer to any of the dissent's queries would directly contradict the statute's specific (continued…)

The specter of denying meritorious claims as untimely further informs numerous other factors that the Statutory Construction Act suggests when confronting ambiguous language. Two helpful considerations that the Act urges upon us are the "mischief to be remedied" and the "object to be attained" by the statute.[135] The "mischief to be remedied" by Section 9543.1 is the incarceration of innocent people, for the remainder of their natural lives in many cases. The "object to be attained" is the provision of a mechanism that affords relief from such egregious miscarriages of justice. A strict reading of the "timely manner" clause in derogation of the words "at any time" does not serve these legislative ends.

As for the "consequences of a particular interpretation,"[136] we need only consider the tradeoff in the consequences of error. Suppose that a motion incorrectly is deemed to be timely. The worst thing that can happen is that the motion could turn out to lack merit for some other reason, or perhaps it might lead to DNA testing that does not prove fruitful for the applicant. Perhaps DNA testing might even confirm the applicant's guilt. As an unintended benefit, this can only increase public confidence in the criminal justice system. At worst, perhaps some time and resources are expended—something that the General Assembly surely anticipated, given that not all DNA tests could possibly be expected to produce exonerations. On the other hand, if a motion incorrectly is deemed to be *untimely*, an innocent person could spend the rest of his life in prison. The difference

---

direction that an "individual convicted of a criminal offense in a court of this Commonwealth may apply by making a written motion to the sentencing court *at any time* for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction." 42 Pa.C.S. § 9543.1(a)(1) (emphasis added).

[135]     1 Pa.C.S. § 1921(c)(3)-(4).

[136]     *Id.* § 1921(c)(6).

in severity of these outcomes weighs in favor of inclusiveness, which requires only that we read the words "at any time" to mean exactly what they say.

Like the Superior Court, the Commonwealth hardly even acknowledges that Act 147 amended Section 9543.1 to allow requests for DNA testing "at any time," and it expends precious little ink on the matter. In a passing footnote in its brief, the Commonwealth references a different construction of the words "at any time," one offered by the Superior Court in an unreported, non-precedential decision, *Commonwealth v. Luckett*.[137] In *Luckett*, the Superior Court stated that it would "continue to rely on the reasoning of *Edmiston*, even though 42 Pa.C.S. § 9543.1 was amended to add the language 'at any time' after *Edmiston* was issued."[138] As it did in the instant case, the Superior Court in *Luckett* erroneously reduced the "reasoning of *Edmiston*" to its observation of the "over twenty years" that had passed since Edmiston's trial, and its assertion that Edmiston "had not sought DNA testing within a reasonable amount of time after the statute was passed," *i.e.*, Section 9543.1, "despite filing a PCRA petition during that time frame."[139] The *Luckett* panel concluded that the motion before it was untimely for similar reasons. However, unlike the Superior Court in its precedential decision in the instant case, the *Luckett* panel acknowledged and confronted the obvious inconsistency between its approach and the new words "at any time."

---

[137]   *See* Commonwealth's Br. at 31 n.2 (citing *Commonwealth v. Luckett*, 987 MDA 2020, 2021 WL 3088758, at *5 n.9 (Pa. Super. July 22, 2021) (unreported)).

[138]   *Luckett*, 2021 WL 3088758, at *5 n.9.

[139]   *Id.* at *5. This was so, the memorandum in *Luckett* explained, notwithstanding the Superior Court's otherwise accurate observation that, under *Edmiston*, "when determining timeliness, the court must consider the facts of each case and decide whether the purpose of a petitioner's request is to demonstrate his actual innocence or to delay the execution of his sentence or administration of justice." *Id.* (citing *Edmiston*, 65 A.3d at 357). The *Luckett* court, however, did not address the matter in terms of any intent to cause delay, but rather relied solely upon temporal considerations.

*Luckett* attempted to resolve the matter by looking to Act 147's amendment to subsection (a)(1). As noted above, in addition to providing that the motion for DNA testing may be filed "at any time," Act 147 also removed the previous requirement that the applicant be "serving a term of imprisonment or awaiting execution because of a sentence of death."[140] The *Luckett* panel reasoned that, "[c]omparing the two versions of the statute, it is clear that the legislature intended to expand the number of individuals eligible to apply for DNA testing, *i.e.*, removing the language making only those actively serving sentences eligible for relief, while expanding the 'timeliness' language in order to guard against exploitation of the statute by those who could have filed their petitions sooner."[141] On this reading, the General Assembly added the words "at any time" to subsection (a)(1) to underscore that applicants need no longer be actively serving criminal sentences, and to provide that they can apply for DNA testing even after release from incarceration or state supervision. Therefore, the argument goes, the court may read the "timely manner" clause strictly, and may dismiss a motion if it believes that an applicant waited "too long" to file the motion, however long that "too long" may be.

Today's dissent adopts the *Luckett* panel's reading of the words "at any time." Respectfully, the position is unpersuasive. *Luckett*'s and the dissent's interpretation would require us to conclude that the words "at any time" do not, in fact, refer to the time for filing, but refer instead to a category of individuals. If the aim of the amendment was solely as the dissent surmises, there would be no reason for the General Assembly to add the words "at any time" to the statute. The expansion of the class of potential applicants under subsection (a)(1) was fully achieved by the elimination of the serving-a-

---

140     *See supra* n.28 and accompanying text for the full text of Act 147's amendment to subsection (a)(1), with additions and omissions noted.

141     *Luckett*, 2021 WL 3088758, at *5 n.9.

sentence prerequisite, *i.e.*, there was a restriction upon the class of applicants, and that restriction was removed. The removal of the restriction is fully sufficient in itself to expand the class. The words "at any time" do not define, modify, or otherwise refer to the identity of that class.

Illustrating a significant contrast, after Act 147, where Section 9543.1 is intended to refer to classes of applicants, the statute draws the distinction expressly, not *sub silentio* or merely by implication. For instance, and as discussed further below, the statute differentiates in the standards applicable to applicants "under State supervision" and those "not under State supervision."[142] Thus, where the General Assembly intended to refer to a class of applicants, it was not ambiguous about it, and it did not code such a reference by using a phrase like "DNA testing may be sought at any time."[143]

Moreover, the dissent's reading relies upon a comparative analysis of the differences between the versions of subsection (a)(1) (which lay readers, presumably, are expected to ascertain), but it is not subsection (a)(1) that poses a statutory construction challenge—it is subsection (a)(4). Subsection (a)(1) is not complicated. It consists of a single sentence, the subject of which is an "individual convicted of a criminal offense in a court of this Commonwealth."[144] A member of that clearly defined class "may apply by making a written motion to the sentencing court at any time for the performance of forensic DNA testing" of specific evidence in his case.[145] This language is as clear as day. The dissent's approach strains to read ambiguity into subsection (a)(1)'s use of "at any time," and then imports that purported ambiguity into subsection (a)(4) in order to

---

[142]  42 Pa.C.S. § 9543.1(a)(6), (d)(2).

[143]  *Id.* § 9543.1(a)(4).

[144]  *Id.* § 9543.1(a)(1).

[145]  *Id.*

convert "at any time" into an ungrammatical reference to the category of individuals who may apply for DNA testing. Even if such was the goal, and even if the legislature did not actually mean subsection (a)(1) to say that DNA testing is accessible at any time, it remains the case that the proposed construction of *subsection (a)(4)* is deeply unintuitive. If one were to write a statute to do solely what *Luckett* and the dissent suggest—to broaden the category of individuals who may apply for DNA testing—the language of subsection (a)(4) is not how one would go about it. There is no reasonable, common-sense reading of the words "DNA testing may be sought at any time" in which the words "at any time" could refer to a category of individuals rather than the concept of "time."

Finally, the dissent's reading of the words "at any time" is far outweighed by all of the principles of statutory construction discussed above. We understand the words "at any time" to mean "at any time." We find this to be consistent not only with the ordinary meaning of words, but also with the need for liberal construction of remedial provisions, with the preference for specificity over generality, with the prioritization of more recent provisions over older ones, and with a proper understanding of the mischief to be remedied, the object to be attained, and the consequences of competing interpretations. The dissent, by contrast, favors an interpretation that would foreclose relief for applicants based solely upon the passage of time, the words "at any time" notwithstanding. Such an interpretation plainly defeats the remedial purpose of Section 9543.1. From a statutory construction standpoint, the reading has little going for it. The dissent purports to rely upon three factors listed in the Statutory Construction Act: the "former statute," the "mischief to be remedied," and the "object to be attained." In substance, however, the dissent conducts a single inquiry, placing dispositive weight upon the assumed significance of one point of distinction between the pre-Act 147 and post-Act 147 versions of Section 9543.1: the expansion of the class of potential applicants to include the

formerly incarcerated.[146] As discussed above, this is not a persuasive reason to so dramatically alter the meaning of a phrase as straightforward as "at any time." But even more importantly, reading the statute in such a manner is inconsistent with myriad principles of statutory construction, and merely creates an additional point at which a truly innocent person's claim may fail, in contradiction of the language of the statute, and for no particularly good reason.

No interpretation of a provision as facially perplexing as Section 9543.1(a)(4) will fully eliminate the challenges that the language presents on its face. Yet, the best understanding of the statute's timeliness provisions allows their words to coexist and to adhere to prior judicial construction. After Act 147, an applicant may file a motion for post-conviction DNA testing "at any time."[147] This means that there is no fixed temporal period within which the applicant must seek DNA testing, and no invisible clock that is running against the applicant from any particular time. Nonetheless, the motion must be "made in a timely manner," which, consistent with *Edmiston*, means that it is aimed "not to delay the execution of sentence or administration of justice," but rather is designed "for the purpose of demonstrating the applicant's actual innocence."[148]

Hardy's petition for testing was timely. He was authorized to file it "at any time." Unlike in *Edmiston*, there is no indication that Hardy advanced his motion in order to cause delay, or for any other improper purpose. Hardy's sentence is final, he has no other pending matters, and he is not facing a sentence of death. The only thing that he

---

[146] Concurring and Dissenting Opinion (Mundy, J.) at 26 ("We should therefore consider the former statute, the mischief to be remedied, and the object to be attained, which in the present context are all interrelated since we are primarily considering the inclusion of "at any time" in paragraph (a)(1) as effectuated by the 2018 amendments.").

[147] 42 Pa.C.S. § 9543.1(a)(1), (a)(4).

[148] *Id.* § 9543.1(a)(4), (d)(1)(iii); *see generally Edmiston*.

could delay, were he so inclined, is his own potential exoneration. Hardy filed the requisite statement attesting that he filed the motion in a genuine attempt to prove his innocence. There is no indication to the contrary. Hardy's petition was therefore timely under the language of Section 9543.1 and under what remains of *Edmiston* after Act 147. The Superior Court erred in concluding otherwise.

## B. Previously Tested and Previously Untested Evidence

The second issue before us concerns the lower courts' determinations that all of the evidence that Hardy sought to have tested failed to meet the requirements of Section 9543.1(a)(2). Here, as well, language added by Act 147 is significant. The trial court[149] addressed Hardy's petition by dividing the evidence into two categories—evidence that had never been tested for DNA previously, and evidence that previously had been subject to DNA testing but that excluded Hardy at that time. Because this is a new distinction in the law after Act 147, this was a reasonable line to draw. There was, however, error on both sides of that line.

### (i) Previously Untested Evidence

The evidence in question was all discovered before Hardy's trials. Under Section 9543.1(a)(2), this implicates the following standard, with the language added by Act 147 again emphasized for clarity:

> If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, **or the evidence was subject to the testing, but newer technology could provide substantially more accurate and substantially probative results,** or the applicant's counsel sought funds from the court to pay for

---

[149] We principally address the trial court's reasoning on this issue because, while the Superior Court did not discuss the matter, it alluded favorably to the trial court's rationale. *See Hardy*, 274 A.3d at 1249-50.

the testing because his client was indigent and the court refused the request despite the client's indigency.[150]

Looking to the language stating that the evidence at issue was not "subject to the DNA testing requested because the technology for testing was not in existence at the time of trial," the trial court denied Hardy's request because some form of "technology for testing"—however primitive by comparison with modern techniques—existed at the time of Hardy's trials. By contrast, Hardy points out that the relevant language concerns evidence that has not been "subject to the DNA testing requested," which he understands as referring to the type of DNA testing requested in the applicant's motion, *i.e.*, the "newer technology" that was unavailable at the time of trial. This gives rise to two potential interpretations of the statutory language. On the trial court's reading, DNA testing is unavailable if any form of DNA testing existed at the time of trial. On Hardy's reading, DNA testing is unavailable only if the specific form of DNA testing that is requested in the applicant's motion also existed at the time of trial.

Like the post-Act 147 version of the law's timeliness provisions discussed above, the amendment to Section 9543.1(a)(2) presents some complexities. The primary difficulty is that the new language introduced two new distinctions. Before 2018, the statute did not contemplate "older" or "newer" forms of DNA testing technology, and it did not authorize retesting at all. Rather, subsection (a)(2) generally precluded DNA testing of evidence discovered pre-trial, absent one of the three provided exceptions. Each of these exceptions concerned situations in which the applicant was unable to obtain *any* pre-trial DNA testing, either because "the technology for testing was not in existence," or because the applicant's counsel failed to request DNA testing in a case that went to trial

---

[150]    42 Pa.C.S. § 9543.1(a)(2) (added language in bold); *see* Act 147, § 1; *supra* n.32.

before 1995, or because the court denied the funds for testing despite the applicant's indigency.

Because, before Act 147, Section 9543.1(a)(2) only concerned the question of whether DNA testing had been conducted at all, the language was not especially precise in its usage of the words "testing" or "the testing." The subsection referred to evidence that had not been subject to "the DNA testing requested," but also referred generally to "the technology for testing," counsel's decision to "seek testing," and the funds to "pay for the testing." Any differences in this regard were immaterial at the time because the statute only envisioned an applicant seeking "DNA testing" in the abstract. The existence of "newer" or "older" testing technology was not within the contemplation of subsection (a)(2) at all. After all, as *Edmiston* said of the pre-Act 147 version of Section 9543.1, "the statute does not make advances in technology an excuse for failing timely to request DNA testing."[151] At the time, it did not.

Matters changed significantly with Act 147's insertion of the "newer technology" provision. Though clear in intent, this amendment complicates the textual analysis somewhat. The "newer technology" provision provides for the retesting of evidence, which was not previously authorized by the statute. The new language expressly authorizes DNA testing where "the evidence was subject to the testing, but newer technology could provide substantially more accurate and substantially probative results." The reference to "the testing," although echoing the older language in the subsection, produces facial tension. With the insertion of the new clause, subsection (a)(2) now provides that "the evidence shall not have been subject to the DNA testing requested because . . . the evidence was subject to the testing . . . ." This imprecision in the use of the words "testing" or "the testing" leaves less than fully clear the issue of whether the

---

[151]     *Edmiston*, 65 A.3d at 358.

General Assembly intended that "newer technology" would be available for previously *untested* evidence, or whether, as the trial court reasoned, previously untested evidence must remain so forever.

We conclude that Hardy's interpretation makes better sense of the language of Section 9543.1(a)(2). That subsection refers to evidence that has not been subject to "the DNA testing requested." On its face, this appears to reference the form of DNA testing that was "requested" in the applicant's motion. After Act 147, the form of testing "requested" is now significant, as there is now a distinction in the statute between older and newer forms of DNA testing. The language does not refer to evidence not previously subject to "any DNA testing" or the like, or even merely to "DNA testing" in the abstract. Rather, the language is specific to the testing "requested." This favors Hardy's interpretation. To the extent that this language is ambiguous, our earlier discussion of the remedial purpose of Section 9543.1 and the liberal construction of its provisions carries salience here, and counsels us to disfavor the construction that would lead to more evidence being excluded from DNA testing. Such would undoubtedly be the result of the trial court's interpretation.

Under the lower courts' approach, from about the time of Hardy's trial onward, nearly *no* applicant would be able to obtain DNA testing of *any* previously known, previously untested materials. If the applicant's trial took place at any time after roughly this period in the 1990s, then there was some form of DNA testing technology available. Under the trial court's approach, this circumstance would preclude DNA testing under Section 9543.1(a)(2). This would be a particularly unintuitive outcome given the language and intent of Act 147, which plainly sought to embrace the availability of modern testing technology. It would be strange indeed if the General Assembly specifically amended Section 9543.1(a)(2) to authorize the use of DNA testing technology newer than that

which existed at the time of an applicant's trial, but *only* if the evidence in question had already been tested with some inferior technology of the time, while all other evidence, which has never been examined at all, must languish away in storage forever. More likely, the General Assembly added the "newer technology" provision to specifically authorize retesting, while understanding the existing reference to evidence that has not been "subject to the DNA testing requested" as authorizing DNA testing of previously untested evidence with the same, newer form of testing technology requested in the motion.

### (ii) Previously Tested Evidence

The lower courts' treatment of Hardy's request to retest certain evidence pursuant to the "newer technology" provision of Section 9543.1(a)(2) presents a narrower and less nuanced issue. With regard to previously tested evidence, the trial court stressed that Hardy had been *excluded* from all previously tested DNA, so the court reasoned that further testing could only confirm that Hardy's DNA remains absent, which would not be "substantially probative" for purposes of Section 9543.1(a)(2)'s newer technology provision. Although the Superior Court approved this rationale without further analysis, its later comment that the absence of Hardy's DNA would not be probative of his innocence is consonant with the trial court's conclusion in this regard.[152]

There is no dispute that, as compared with the testing performed in the 1990s in this case, "newer technology" for testing DNA presently exists, and that modern testing techniques are capable of producing "substantially more accurate and substantially probative results."[153] Much of Hardy's petition was dedicated to detailing the nature of

---

[152]   *See Hardy*, 274 A.3d at 1250 ("While the presence of [Hardy's] DNA would be inculpatory, its absence would not be exculpatory.").

[153]   42 Pa.C.S. § 9543.1(a)(2).

modern DNA testing and its improvements over older techniques, and such was also the purpose of Hardy's submission of the affidavit of DNA expert Alan Keel, who provided further detail on the current state of DNA testing technology.  The Commonwealth did not dispute Hardy's identification of the relevant testing techniques, nor did it challenge the averments of Keel's affidavit.  There is no reasonable debate as to whether DNA testing technology has advanced since 1996.[154]

With regard to the previously tested evidence in this case and the applicability of Act 147's "newer technology" provision, the lower courts' errors are plain.  The initial premise is true:  Hardy was not implicated by any of the previous DNA testing in this case.  To suggest that retesting the evidence with modern techniques could do nothing other than confirm that result is to disregard the obvious possibility that testing could reveal the DNA of *someone else*, *i.e.*, a perpetrator other than Hardy.  Given the emphasis that

---

[154]    We note that, in a case where there is a shorter period of time between an applicant's trial and request for DNA testing, there could be a dispute as to whether DNA testing technology had improved to a sufficient degree in the interim so as to satisfy the "newer technology" provision of Section 9543.1(a)(2).  In such a case, where the state of DNA testing technology produces a disputed issue of fact, the trial court may need to conduct an evidentiary hearing on the matter.  There is no such dispute in this case.

Notwithstanding the absence of any dispute as to whether DNA testing has improved since the 1990s to a degree that would satisfy the "newer technology" provision, the dissent would nonetheless remand for an evidentiary hearing at which the parties would be required to produce "testimony concerning the allegations contained in Mr. Keel's affidavit."  Concurring and Dissenting Opinion (Mundy, J.) at 46.  Such a hearing is not necessary because, as the dissent acknowledges, there is no dispute as to the improved state of DNA testing technology and, thus, no disputed issue of fact to be addressed at an evidentiary hearing.  As we have explained in the analogous context of PCRA litigation, an evidentiary hearing is to "be held on a post-conviction petition where there are factual issues to be resolved," but where "the issues raised in a petition involve no disputed factual issues, a hearing thereon is clearly not necessary and a resolution thereof without such a hearing does not violate the rules." *Commonwealth v. Banks*, 656 A.2d 467, 473 (Pa. 1995); *see also Commonwealth v. Carpenter*, 725 A.2d 154, 170 (Pa. 1999) ("[W]hen there are no disputed factual issues, an evidentiary hearing is not required under the rules."); *Commonwealth v. Morris*, 684 A.2d 1037, 1042 (Pa. 1996) (same).

Hardy placed upon the "redundant profile" and "database" theories in his petition—both of which theories describe avenues by which an alternative perpetrator may be discovered—it requires a particularly obtuse reading of Hardy's averments to disregard this possibility.

Although this inquiry bleeds into the third issue in this appeal, which concerns the likelihood of the proof of actual innocence, we must comment upon the lower courts' suggestion that the anticipated absence of DNA from a tested item cannot be probative. The lower courts' rationales echoed the Commonwealth's invocation of the saying: "absence of evidence is not evidence of absence," a maxim that also has surfaced in Superior Court precedent.[155]  Although this pithy saying exudes the whiff of a wise aphorism, it is not universally true.  For instance, if one finds an absence of evidence in a place where the evidence certainly would be expected to be found, then the absence of that evidence can be suggestive of absence.  Such may not be conclusive, but it is erroneous to claim that the absence of evidence can never even be probative.  It would be better (though not as snappy or rhythmic) to say that the absence of evidence is not *conclusive* evidence of absence.  The Superior Court acknowledged this in its *en banc* decision in *Payne*, in which it noted previous cases holding that "the absence of a petitioner's DNA, *by itself*, cannot demonstrate 'actual innocence'" for purposes of Section 9543.1, but that nothing in the statute requires the discovery of another's DNA either.[156] Rather, the *Payne* court held, the "quantum of evidence" necessary to demonstrate actual innocence "above and beyond the absence of the petitioner's DNA has been, and should

---

[155]    Commonwealth's Response at 19; *see*, *e.g.*, *Commonwealth v. Heilman*, 867 A.2d 542, 547 (Pa. Super. 2005) ("In DNA as in other areas, an absence of evidence is not evidence of absence.").

[156]    *Payne*, 129 A.3d at 559 (emphasis in original).

continue to be, determined on a case-by-case basis, as circumstances dictate."[157] We agree. The idea that "absence of evidence is not evidence of absence" should not be invoked as a totemic basis for disregarding claims of innocence or otherwise denying access to DNA testing. A more discerning inquiry into the facts and circumstances is required.

This is not to say that, in this case, the absence of Hardy's DNA from a particular piece of evidence would necessarily prove anything. The point is that discovery of such absence is not the only possible outcome of the requested testing. As Hardy has made abundantly clear from the outset of this litigation, his claim is not dependent upon the prospect that DNA testing will merely confirm the absence of his DNA from the evidence in question. Hardy's theory is that DNA testing of the evidence in his case could reveal the identity of a different perpetrator. It was plainly erroneous for the lower courts to disregard this possibility.

The lower courts erred in rejecting Hardy's request under Section 9543.1(a)(2). That provision erects no hurdle to Hardy's request for DNA testing of either previously tested or previously untested evidence.

### C. *Prima Facie* Case

This leaves us with the final issue presented by this appeal: the sufficiency of Hardy's effort to present a "*prima facie* case" demonstrating that the identity of the perpetrator was at issue at trial, and that "DNA testing of the specific evidence, assuming exculpatory results, would establish" his "actual innocence."[158] There is no question that identity was a disputed issue at trial, for Hardy asserted his innocence and contended that Will was murdered by another. The statutory question implicated here is the nature

---

[157]  *Id.*

[158]  42 Pa.C.S. § 9543.1(c)(3)(ii)(A).

of the applicant's *prima facie* burden to show that exculpatory results of the requested testing would establish his "actual innocence."

This Court has never directly addressed the statute's *prima facie* burden. The relevant terms, however, have been interpreted in decisions of the Superior Court, most notably in its *en banc* decision in *Payne*. The *Payne* court noted that "Section 9543.1 frequently incorporates, yet fails to define, the term 'actual innocence.'"[159] The court looked to its earlier decision in *Conway*, which adopted a standard from the United States Supreme Court's decision in *Schlup v. Delo* that is well-known in federal *habeas corpus* jurisprudence: to wit, that newly discovered DNA evidence must make it "more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt."[160] *Conway* additionally quoted *Schlup* for the clarification that this standard requires "a probabilistic determination about what reasonable, properly instructed jurors would do" if presented with the new evidence.[161]

*Payne* was not focused directly upon the "*prima facie* case" language in Section 9543.1(c)(3), but rather upon its corollary, subsection (d)(2), which directs the court to deny a request for DNA testing if it finds "no reasonable possibility" that the testing "would produce exculpatory evidence" demonstrating the applicant's "actual innocence."[162] The court, however, equated the "no reasonable possibility" inquiry with the applicant's *prima facie* burden.[163] *Payne* further emphasized that the question under the statute is not

---

[159]   *Payne*, 129 A.3d at 556.

[160]   *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Conway*, 14 A.3d at 109).

[161]   *Conway*, 14 A.3d at 109 (quoting *Schlup*, 513 U.S. at 329).

[162]   *Payne*, 129 A.3d at 555-56; 42 Pa.C.S. § 9543.1(d)(2). As discussed below, this subsection was amended in Act 147 to add an elevated "reasonable probability" standard for certain classes of applicants.

[163]   *Payne*, 129 A.3d at 560, 562-63.

whether DNA testing is "likely" to produce exculpatory evidence, but rather whether there is a "reasonable possibility"[164] of such.  The *en banc* panel commented:

> It should go without saying that the most *likely* result of Section 9543.1 DNA testing will corroborate a petitioner's guilt, confirm it outright, or simply fail to cast significant doubt on the verdict.  However, the very purpose of Section 9543.1 must be to afford a petitioner the *opportunity* to demonstrate the unlikely.  The threshold question is, therefore, not the likelihood of proof of innocence, but whether it is within the realm of reason that some result(s) could prove innocence.[165]

Like the "timely manner" clause discussed above, neither the original version of Section 9543.1 nor the post-Act 147 version provides a definition of "actual innocence." However, the Superior Court's adoption of the *Schlup* standard for assessing actual innocence—more likely than not that no reasonable juror would have found the applicant guilty beyond a reasonable doubt—has been clearly established precedent since at least the *en banc* panel's decision in *Payne* a decade ago.  We discern no cause to disturb that settled understanding of the term "actual innocence" here.

As for the nature of the applicant's burden to demonstrate a *prima facie* case establishing that DNA testing, assuming exculpatory results, would meet that "actual innocence" requirement, this is a question of first impression.  *Payne*'s discussion is informative and insightful concerning the best source for guidance on the meaning of the *prima facie* burden; we look to the provision that tells the court what to do if the applicant fails to meet that burden.  Under Section 9543.1(d)(2), the court is directed to deny the request for DNA testing if there is "no reasonable possibility" that "the testing would produce exculpatory evidence that . . . would establish the applicant's actual

---

164     42 Pa.C.S. § 9543.1(d)(2); *see also id.* § 9543.1(a)(6) (added by Act 147).

165     *Payne*, 129 A.3d at 563 (emphasis in original) (footnote omitted).

innocence."[166] If for no other reason than avoidance of the baffling asymmetry that would result from requiring something different of the applicant than the court is required to find, it follows that the *prima facie* burden of Section 9543.1(c)(3) refers to the same "reasonable possibility" standard of Section 9543.1(d)(2)—at least in this case.

We offer that caveat because Act 147 changed matters in this regard. Up until this point in our analysis, we have relied only upon language that was not amended in Act 147—"*prima facie* case" and "reasonable possibility"—and which appeared in the statute when the Superior Court decided *Payne*. Those terms always informed each other. Although Act 147 did not alter the *prima facie* language, it spoke to the applicable standards. Before Act 147, the "no reasonable possibility" standard applied to the court's review of all requests under subsection (d)(2). Now, subsection (d)(2) provides:

> (2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility for an applicant under State supervision, or there is no reasonable probability for an applicant not under State supervision, or after review of the record of the applicant's guilty plea, the court determines that there is no reasonable probability, that the testing would produce exculpatory evidence that:
>
> > (i) would establish the applicant's actual innocence of the offense for which the applicant was convicted[.][167]

Act 147 also added a new, parallel provision, subsection (a)(6), which states that, if the applicant is "under State supervision," then the applicant's "motion shall explain how, after review of the record of the applicant's trial, there is a reasonable possibility" that the "testing would produce exculpatory evidence that would establish . . . the applicant's actual innocence" of the offense.[168] As in subsection (d)(2), the standard is

---

[166]   42 Pa.C.S. § 9543.1(d)(2)(i).

[167]   *Id.*

[168]   *Id.* § 9543.1(a)(6)(i).

elevated to "reasonable probability" for applicants "not under State supervision" or those who entered guilty pleas.[169] This is the General Assembly's articulation of the applicant's *prima facie* burden under subsection (c)(3). It would be incongruous to interpret the "*prima facie* case" requirement of subsection (c)(3) as imposing some unspoken, more exacting burden than the General Assembly expressly articulated as the applicable standard in subsections (a)(6) and (d)(2).

Post-Act 147, the nature of the applicant's *prima facie* burden now turns upon the identity of the applicant. As the amended law specifies, an applicant "under State supervision," such as Hardy, must establish a "reasonable possibility" that the DNA testing requested would produce evidence meeting the actual innocence standard, *i.e.*, making it more likely than not that no reasonable juror would have found the applicant guilty beyond a reasonable doubt.[170] For an applicant not under state supervision or who entered a guilty plea, the statute elevates the applicant's burden to a "reasonable probability." If the applicant fails to meet his burden, and if the court finds that there is "no reasonable possibility" (or "probability," as the case may be) that the requested DNA testing would produce results meeting the actual innocence standard, then the court is directed to deny the request under subsection(d)(2)(i).[171]

These formulations are consistent with the general understanding that the establishment of a *prima facie* case is a low burden in the law.[172] The term does not

---

[169] *Id.*

[170] *Id.* § 9543.1(c)(3), (a)(6), (d)(2).

[171] *Id.* § 9543.1(d)(2)(i).

[172] *See Prima facie case*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("1. The establishment of a legally required rebuttable presumption. 2. A party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor.").

evince the application of a "clear and convincing evidence" standard or the like. This is underscored, moreover, by the direction that a court considering the sufficiency of the applicant's *prima facie* case must assume that exculpatory results are possible from the requested testing.[173] The court must consider the possibility that the applicant's theory could be correct.

All of these considerations lead to the conclusion that the Superior Court's analysis of this issue here was flawed. Notably, although it was making binding precedent for the Superior Court, the panel in the instant case did not cite that court's *en banc* decision in *Payne*, and it considered neither the standards applicable to the *prima facie* showing nor the understanding of the term "actual innocence." Rather, the Superior Court first faulted Hardy for emphasizing his own perspective on the trial evidence, in that he "views the facts in his favor, rather than the light most favorable to the Commonwealth as verdict winner."[174]

The standard that the Superior Court referenced is a component of an appellate court's review of a challenge to the sufficiency of the evidence to sustain a conviction on direct appeal, and that is what the Superior Court's analysis most resembles.[175] The Superior Court cited no authority for its assumption that a court—let alone the applicant—is obliged to view the evidence as such in the context of a Section 9543.1 motion. Such a standard is inappropriate. Review for the sufficiency of the evidence requires viewing the evidence in the Commonwealth's favor because the inquiry is concerned with whether

---

[173] 42 Pa.C.S. § 9543.1(c)(3)(ii).

[174] *Hardy*, 274 A.3d at 1250.

[175] *See, e.g.*, *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) ("When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.").

the prosecution produced a sufficient minimum quantum of evidence for each element of an offense, such that a fact-finder could have found the necessary facts beyond a reasonable doubt. The inquiry under Section 9543.1 is not whether the Commonwealth's evidence at trial was sufficient to sustain the applicant's conviction; in many instances, the case will already have survived appellate review of that question. The question is whether the applicant is actually innocent, and, more specifically, whether it is possible that evidence of such actual innocence might be uncovered. As discussed, particularly given the "assuming exculpatory results" proviso, the Section 9543.1 inquiry requires an assessment of the reasonable possibility that the applicant's theory of innocence might, in fact, be correct. It is not adequate merely to conclude that, viewed in the light most favorable to the Commonwealth, there was sufficient evidence of the applicant's guilt.

The Superior Court erred in considering only the evidence supporting the Commonwealth's theory, and in suggesting that any contradiction of that theory amounts to mere "conjecture and speculation."[176] Section 9543.1 does, indeed, require the court to engage in a speculative endeavor. This case concerns the parameters of the *request* for DNA testing. The DNA test *results* that might establish the applicant's "actual innocence" under the above-discussed standard do not actually exist yet, because the testing has not yet been performed. The applicant necessarily must offer some "speculation and conjecture" as to what the requested DNA testing might reveal.

The Superior Court did not engage with Hardy's explanations of how DNA testing might reveal evidence of his innocence in practice, *i.e.*, the "redundant profile" and "database" theories. The theories, as noted, are that the DNA of an alternate perpetrator might repeatedly be discovered on significant items of evidence, or that it might match the DNA of an individual listed in a DNA database, such as CODIS. Notably, the Superior

---

[176]     *Hardy*, 274 A.3d at 1251.

Court in *Conway* spoke approvingly of such inquiries, and the *en banc* panel in *Payne* favored *Conway*'s approach.[177]  We find these theories edifying, inasmuch as they detail the actual means by which DNA experts can infer that a crime likely was committed by an individual other than the one who was convicted for it.  They are, however, universal considerations that are not reliant upon the facts of any given case.  Thus, while the "redundant profile" and "database" theories do much to ground the inherently speculative endeavor contemplated by the statute, they are not essential components of the applicant's *prima facie* burden as such.

We understand the "*prima facie* case" language of Section 9543.1(c)(3) as requiring the applicant to make a case-specific showing that there is a "reasonable possibility" (or a "reasonable probability," depending upon the identity of the applicant)[178] that "DNA testing of the specific evidence, assuming exculpatory results, would establish" the applicant's "actual innocence" of the offense in question,[179] with "actual innocence" referring to the proposition that the anticipated, newly discovered DNA evidence would make it more likely than not that no reasonable juror would have found the applicant guilty beyond a reasonable doubt.[180]  This is a highly fact-sensitive inquiry that will depend upon the nature of the Commonwealth's evidence identifying the applicant as the perpetrator of the offense, as well as the possibility that the defense's theory of innocence could have been accepted as true by the fact-finder, if new and favorable DNA evidence were obtained.

---

[177]  *See Conway*, 14 A.3d at 110-14; *Payne*, 129 A.3d at 563-66.

[178]  42 Pa.C.S. § 9543.1(a)(6), (d)(2).

[179]  *Id.* § 9543.1(c)(3)(ii)(A).

[180]  *See Payne*, 129 A.3d at 556 (citing *Conway*, 14 A.3d at 109; *Schlup*, 513 U.S. at 327).

Hardy met his *prima facie* burden. The evidence of record establishes that Hardy challenged essential aspects of the Commonwealth's evidence identifying him as Will's killer. There was conflicting evidence as to the time and location of Will's death; that this occurred inside the Erisco factory at approximately midnight, which was critical to the Commonwealth's theory that Hardy murdered Will at that location and at that time. There was evidence of Hardy's guilt; if the Commonwealth was correct that Will was killed inside the Erisco plant shortly after the end of her shift, then Hardy had the opportunity, and his former relationship with Will may have given him a motive. Hardy was the lead suspect, and for good reason.

However, it is also possible that DNA testing of some of the items that Hardy sought could reveal, through a redundant DNA profile or a database hit, a different, particularly suggestive DNA profile. Subsection (c)(3) requires us to assume such favorable results. If such results were to be obtained, there is a reasonable possibility that, despite the strength of the Commonwealth's circumstantial evidence, a reasonable juror could have placed greater weight upon Hardy's emphasis of the weaknesses in the Commonwealth's case, and could have come to believe that he did not murder Deborah Will. As the Superior Court noted in *Conway*, "the relative weight of the Commonwealth circumstantial evidence would obviously be outweighed by the discovery of relevant DNA evidence constituting substantial direct evidence of the identity of a separate assailant."[181]

In light of these observations, and given Hardy's demonstration that he always has maintained his innocence, that the evidence against him was purely circumstantial, that he was not implicated by any of the prior forensic or DNA testing of the evidence, and that there were at least potential alternative suspects, Hardy sufficiently has demonstrated a reasonable possibility that testing of at least some of the identified

---

[181] *Conway*, 14 A.3d at 110.

evidence would produce an exculpatory outcome, through which he could establish his actual innocence.  This is sufficient to satisfy his *prima facie* burden.  The Superior Court erred in holding otherwise.

Because we reverse the Superior Court's decision on legal grounds, *i.e.*, its use of improper standards, its lack of adherence to precedent, and its failure to interpret or apply the relevant language of the statute, we decline at this juncture to parse each item of evidence that Hardy seeks to subject to DNA testing or to opine as to whether each meets the statutory requirements for testing.  Rather, having clarified the governing legal standards, we leave the assessment of individual items to the lower courts and the parties on remand.  Moreover, the parties are free to engage in good-faith discussion and to enter into any appropriate stipulations that might be reached concerning the scope of the requested testing.

## V.

As the Superior Court wrote in *Conway*, Section 9543.1 seeks to "ensure the most fundamental principle of American jurisprudence, namely, that an innocent man not be punished for the crimes of another."[182]  This is a matter of great importance.  It demands the careful attention of any court presented with a request for post-conviction DNA testing.  The lower courts did not afford Hardy's petition the reasoned consideration to which it is entitled, initially or on appeal.  The courts largely failed to engage with the new statutory language that brought Hardy before them, and which facially calls into question the decision to dismiss his petition as untimely (*i.e.*, "at any time").

In fairness to the lower courts, Section 9543.1 is not a model of clarity.  The 2018 amendments of Act 147 include language—both new and familiar—that produces some challenging constructions when read against the existing statutory provisions.

---

[182]     *Id.* at 114.

Nonetheless, the intent of that enactment to broaden access to post-conviction DNA testing is clear.

Hardy's petition was timely. The statute does not bar the testing that he sought with regard to any category of evidence, whether previously tested or not. Hardy sufficiently set forth a *prima facie* case that the requested DNA testing, assuming exculpatory results, would establish his actual innocence.

The order of the Superior Court is reversed, and the matter is remanded for further proceedings consistent with this opinion.

Chief Justice Todd and Justices Donohue and McCaffery join the opinion.

Justice Mundy files a concurring and dissenting opinion in which Justices Dougherty and Brobson join.